SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

WORLD–WIDE COIN INVESTMENTS, LTD., Joseph H. Hale, and Floyd W. Seibert, Defendants.

Civ. A. No. C 81–1642 A.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 23, 1983.

See also D.C., 92 F.R.D. 65.

Barton S. Sacher and Walter E. Jospin, S.E.C., Atlanta, Ga., for plaintiff.

Oliver Lee, Hurt, Richardson, Garner, Todd & Cadenhead, Atlanta, Ga., for defendant World-Wide Coin.

C.B. Rogers, Rogers & Hardin, Atlanta, Ga., for defendants Hale and Seibert.

## MEMORANDUM OPINION AND ORDER

VINING, District Judge.

This is a securities fraud action in which the Securities and Exchange Commission (SEC) seeks a permanent injunction against World-Wide Coin Investments, Ltd. (World-Wide) and the individual defendants[1] as well as an order for a full accounting and disclosure of wrongfully received benefits. In an order entered March 29, 1983, this court directed the clerk to enter judgment for the SEC on all counts of the complaint and further directed defendants Hale and Seibert to (1) retain an independent auditor to perform a full accounting of World-Wide of all receipts and disbursements of cash and all purchases and sales and other acqui-

---

1. Joe Gregory Jones, a member of the board of directors of World-Wide from August 1, 1980, to April 7, 1981, the vice president of World-Wide and a director of Florafax International, Inc. (a related company), was initially named as a defendant in this action, but entered into a consent order of compliance following service of the complaint.

sitions and dispositions of inventory and assets since July 1, 1979, and (2) return whatever shares of World-Wide stock they might hold to World-Wide. Finally, the court ordered World-Wide to make a full disclosure to its present shareholders with respect to all material information relating to its operations since July 1, 1979. The following memorandum opinion will constitute this court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

### Factual Background

World-Wide Coin Investments, Ltd., is a Delaware corporation with its principal offices in Atlanta, Georgia, and is engaged primarily in the wholesale and retail sale of rare coins, precious metals, gold and silver coins, bullion, and, until 1979, in the retail sale of camera equipment. Its operations also include the sale of Coca-Cola collector items and certain commemorative items. Its inventory of rare coins comes from its purchases of collections from estates and private individuals, purchases from dealers, purchases on domestic commodities exchanges, and purchases at coin shows. Sales are transacted at the Atlanta office and at many major coin shows held in the United States. For some time it published a trade journal, *The Coin Wholesaler,* which

carried both news and feature stories of special interest to coin collectors and investors, who comprised the majority of subscribers. Until August 1979, through its subsidiary World-Wide Camera Fair, Inc.,[2] World-Wide operated retail stores in Augusta, Athens, Savannah, Columbus, Georgia, and Jacksonville, Florida, selling camera and photographic equipment. All five stores were sold during the first quarter of fiscal year 1980.

World-Wide's common stock is registered with the SEC pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78*l*(b), and until late 1981 was listed on the Boston Stock Exchange. Prior to July 1979, the company's assets totaled over $2,000,000, and it had over 40 employees. In August 1981, the time of the filing of this lawsuit, the company's assets amounted to less than $500,000, and it had only three employees.

Defendant Joseph H. Hale took over the management and control of World-Wide on July 24, 1979, as the controlling shareholder, chairman of the board, chief executive officer, and president.[3] He was formerly a national bank examiner with the United States Treasury Department and was employed as an accountant and auditor for General Motors and the Glidden Company, where he obtained an understanding of the

---

**2.** There are several affiliate companies of defendant Joseph Hale that are involved to some degree in this lawsuit, although none has been sued directly, including World-Wide Camera Fair, Inc., discussed above. The others include: (1) Florafax International, Inc., a publicly held Delaware corporation registered with the SEC having its principal offices in Tulsa, Oklahoma, is engaged in the business of providing services and products to retail florists. Hale is chairman of the board, chief executive officer, and controlling shareholder. Defendant Seibert is a member of the board of directors. (2) East Coast Coin Exchange, Inc., is a wholly owned subsidiary of J.H. International, Inc., a privately held company owned by Hale. East Coast Coin's principal office is located in Atlanta, Georgia, and is engaged in wholesale and retail sales of precious metals and coins. (3) J.H. International, Inc., is a privately held company owned by Hale, engaged in the consulting business. (4) International Systems, Inc., is a privately held company owned by Hale, engaged in the consulting business. (5) Health Care

International, Inc., is also a privately held company owned by Hale, engaged in the consulting business.

**3.** In July 1982, defendants Hale and Seibert resigned as officers and directors of World-Wide. Hale exchanged his shares of World-Wide stock for an equal amount of shares of Management Improvement Corporation of America (MICA), a North Carolina corporation. The chairman of the board of MIC, Larry Amick, has now assumed the position of chairman of the board of World-Wide as well. According to Price, Waterhouse, Inc., MIC's independent auditor, in a report dated March 23, 1982, MIC has a deficit of $7,860,000, an excess of current liabilities over assets in the amount of $2,381,000 and is in default of certain covenants of numerous bank loan agreements. Letter of Securities and Exchange Commission to the court, dated July 9, 1982.

importance of internal controls and the concept of "GAAP" (generally accepted accounting principles). Following these experiences, he became a broker-dealer and is registered with the National Association of Securities Dealers (NASD) and the New York Stock Exchange.

Defendant Floyd Seibert is an employee of Health-Care International, Inc., a member of the board of directors of Florafax, Inc., and in September 1979 became a member of World-Wide's board of directors; he also constitutes World-Wide's one-man audit committee.

## I. HALE'S TAKEOVER OF WORLD–WIDE

Prior to 1979, World-Wide was managed by John Hamrick, who held the positions of president, chief executive officer, and chairman of the board. During his tenure at World-Wide, Hamrick was involved in the rare coin business and operated two subsidiaries, World-Wide Camera Fair and Chattanooga Coin and Stamp, both of which significantly contributed to World-Wide's profits. Hamrick met Hale in 1979, when Hale made an offer of 25¢ a share to purchase control of World-Wide. This offer was not accepted, but Hale subsequently increased his offer to 75¢ a share, and on July 24, 1979, Hale acquired 51% of the common stock of World-Wide from Hamrick, approximately 290,000 shares. Hamrick then resigned as chairman of the board, president, and chief executive officer, and Hale was elected as his successor at a board meeting of the company on that date. Shortly thereafter, the remaining directors of World-Wide resigned, and on September 1, 1979, Hale appointed Jones and Seibert to comprise, in addition to himself, the three member World-Wide board.

As part of Hale's purchase of the controlling block of World-Wide stock, he and Hamrick entered into a consulting agreement, which contained the following terms and conditions: (1) World-Wide would pay Hamrick a consulting fee of $1,000 per month for 15 months, (2) in consideration of this consulting fee, Hamrick's employment contract with World-Wide would be cancelled, and Hamrick would provide Hale with information concerning World-Wide on an as needed basis during the 15-month consulting agreement, (3) Hamrick would resign as the chairman of the board, chief executive officer, and president of World-Wide, (4) Hamrick would remain on the World-Wide payroll at the rate of $5,000 per month until certain loans from him to World-Wide were repaid in full, and until his name was removed from certain guarantees, (5) Hamrick would not open any type of retail coin or bullion business in the five county Atlanta area comprising Fulton, DeKalb, Cobb, Gwinnett, and Clayton Counties for a period of 24 months, and (6) Hamrick would not hire any of World-Wide's current employees for a period of 24 months.

Prior to Hale's acquisition of the controlling shares of World-Wide stock, he met with Robert Whitley, a securities attorney who had assisted Hamrick during his years at World-Wide. In a letter dated July 11, 1979,[4] Whitley set forth the requirements under the federal securities laws with respect to Hale's planned takeover. In that letter, Whitley advised Hale that a Schedule 13D form [5] would have to be filed with

---

4. Plaintiff's Exhibit Number 36.

5. A Schedule 13D form is a form required to be filed by section 13(d) of the 1934 Securities Exchange Act, 15 U.S.C. § 78m(d) and Rule 13d–1, 17 C.F.R. § 240.13d–1. When any person acquires, directly or indirectly, the beneficial ownership of any equity security of the registered security company and who is the beneficial owner of more than 5% of the class of securities, he must disclose certain informa-

tion such as (1) the background and nature of the purchase and purchaser, (2) the source and amount of funds or any other consideration used in making the purchase and a description of any transaction made in acquiring the funds for the purchase, (3) if the purpose of the purchase is to acquire control over the business of the issuer, he must disclose any plans for liquidation or merger or other change in the corporate structure, (4) the number of shares which there is a right to acquire, and (5) any

respect to the purchase of stock and the proposed tender offer, as well as a Form 3 and Form 4 regarding the change in ownership of stock, a Form 8K[6] and a press release. With respect to the tender offer, a Form 14D[7] would have to be filed, and Whitley enumerated some of the information that Hale would have to disclose. Notwithstanding this advice, Hale failed to file a Scheduled 13D form with the SEC. He did file a Form 3 statement as required by section 16(a) of the 1934 Securities Exchange Act[8]; however, it was filed a month late. World-Wide did not file a Form 8K to disclose a change in control of ownership, nor did it file with the SEC or transmit to World-Wide shareholders the information required by section 14(f) of the 1934 Act[9], indicating that the three directors had been selected without shareholder approval. In his letter to Hale, Whitley also set forth his

billable rate and other information should Hale wish to retain him and his law firm as counsel for World-Wide. Hale did not retain Whitley as counsel, and he testified at trial that the company did not have a lawyer on retainer until the initiation of the instant lawsuit.

In addition to acquiring control of World-Wide on July 24, 1979, Hale also persuaded the board of directors to adopt a resolution that authorized the issuance of 300,000 additional shares of common stock at the price of $225,000 (75¢ per share). Hale stated that he would pay for the stock in cash, coins, or rare medals and that if he paid in coins or medals they would be appraised by two outside appraisers.

The minutes of this meeting[10] state that George Humphries, one of the former World-Wide directors, made the motion to

contract or other arrangement with respect to the securities.

6. Form 8K is filed as a requirement of section 13(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78m(a), and Rule 13a–1, 17 C.F.R. § 240.13(a)–11. Form 8K is used to disclose information concerning current or special events, such as the change in control of the registered company, acquisition or disposition ·of the assets, bankruptcy or receivership, changes in the registrant's certified accountant, and other "materially important" events which the registrant deems to be of material importance to the security holders. The requirement of filing a Form 8K applies to all issuers of securities registered pursuant to section 12 of the 1934 Act. A report (three to five copies) must be filed with the SEC within 15 days after the occurrence of any extraordinary event required to be reported. As to any other material development, the report must be filed within 10 days after the end of the month in which the event occurs.

7. Schedule 14D is a form required to be filed pursuant to section 14(d) of the 1934 Securities Exchange Act, 15 U.S.C. § 78n(d)(1), and Rules 14d–3, 14d–6, 17 C.F.R. §§ 240–14d–1, and 14d–6. This requirement applies to any tender offer subject to the 1934 Act and the disclosure provisions are very similar to those required by the proxy solicitation requirements. No bidder shall make a tender offer if, after consummation thereof, the bidder would be the beneficial owner of more than 5% of the class of the

subject company securities for which the tender offer is made, unless (1) he files ten copies of Schedule 14D–1 and (2) he delivers to the subject company all exhibits. This form must be filed as soon as practicable on the date of the commencement of the tender offer.

8. Form 3 and Form 4 statements are reports required to be filed by an issuer pursuant to section 16 of the 1934 Securities Exchange Act, 15 U.S.C. § 78p, 17 C.F.R. §§ 240–16a–1, 16a–2. Initial statements of beneficial ownership of equity securities are required to be disclosed in Form 3; and statements of changes in such beneficial ownership are filed on Form 4. The information contained in these forms are used for the primary purpose of determining and disclosing the holdings of officers, directors, and beneficial owners of registered companies.

9. Section 14(f) of the 1934 Securities Exchange Act, 15 U.S.C. § 78n(f) and Rule 14f–1, 17 C.F.R. § 240.14f–1, requires the issuer to file and send to all voting shareholders certain information prior to the election or designation of a majority of the board. This information includes the total number of outstanding shares, the number of shares owned by the control purchaser, his identity and the transaction by which he claims control, any contractual arrangements, the names and prior occupations of new directors, the stockholdings of all directors, and the directors' respective renumerations.

10. Plaintiff's Exhibit Number 38.

approve this swap of stock for medallions and that the motion was seconded and approved. Humphries, now a coin dealer marketing silver medallions, testified at trial that these minutes are incorrect and that there was no vote on the swap of medallions for stock. When asked who recorded the minutes, Humphries stated that no one took them, although Sue Woods is listed as secretary for the meeting. Humphries also testified that he did not recall any discussion of the proposed appraisal of the medallions. Daniel Anderson, also a former World-Wide director and an investor in rare coins and medallions, testified that although he attended the July 24, 1979, meeting, he did not recall anyone taking the minutes. With respect to the swap of medallions for stock, Anderson testified that no action or vote was taken by the directors on this proposal. The possibility that these minutes were falsified is further substantiated by Hamrick, who testified that no approval was given for the medallion/stock swap while he was present; if a vote was taken by the board, it was done after he had resigned his position with World-Wide. There is substantial testimony to support a finding that the minutes of this July 24, 1979, directors' meeting were falsified, and this court is convinced that approval of the stock swap was expressly conditioned on Hale's obtaining an outside appraisal of the value of the medallions.

On or about September 15, 1979, Hale sold certain bicentennial and other commemorative medals to World-Wide in consideration for the issuance of the 300,000 shares of World-Wide common stock. Hale valued these medals at $225,000, but the testimony at trial revealed that this figure was extremely inflated. Furthermore, Hale never complied with the board's express requirement of obtaining an accurate, outside appraisal of these medals.

The medallions that Hale presented to the company had initially been purchased by East Coast Coin Company in 1976, with the expectation that they could be marketed through various state organizations who were celebrating the bicentennial and the inauguration of President Jimmy Carter. East Coast Coin was not, however, able to sell these medals during the three year period from 1976 to 1979.

Prior to the transfer of the medallions to the company's inventory, Hale was advised by Jerry Bickers, a World-Wide vice president and numismatist, that there was no market for these medallions and that they were worth significantly less than $225,000, since their only worth was in scrap value (the value of an item after it has been melted down). Furthermore, Bickers had advised Hale that there was no "after market" for these commemorative medals and that there was no indication that they would ever be collectors' items. With respect to the value of the medallions, Daniel Anderson testified that they had no resale or market value, their only value being the actual value of the medal itself, which was approximately ⅖ of the value proposed by Hale. George Reid, an employee in the sales department of East Coast Coin and World-Wide, testified that certain commemorative medals such as the 1933 Roosevelt medal could be very valuable, but the majority of medallions are difficult to market after they have been struck.

Hale failed to have the medallions officially appraised as required by the board of directors. He sent a listing of the World-Wide inventory of medals to two coin dealers [11] requesting them to place a value on each type of medallion on the list. The medallions themselves were not sent to these dealers.[12] In a letter to Hale dated

---

11. Plaintiff's Exhibit Number 242 is a letter from Hale dated August 30, 1979, to Dick Johnson of Johnson and Johnson in Danbury, Connecticut. Plaintiff's Exhibit Number 243 is a letter from Hale dated August 30, 1979, to Mal Hoffman in Dallas, Texas.

12. In order to obtain a correct and complete appraisal of medallions and/or rare coins, it is necessary for them to be weighed to determine the amount of precious metal contained in them. It is also necessary for the coins to be

June 18, 1980,[13] Chris Johnson of the Connecticut appraisal firm gave Hale a listing of the current retail market value for the medallions, but this does not constitute an official or accurate appraisal. In a letter dated September 20, 1979, Malvin K. Hoffman, president of the Connecticut Mint, Inc., in Dallas, Texas, told Hale that his evaluations of the medals might be invalid because of the fluctuations in the gold and silver markets.

Neither of these price lists purported to value or price the items as to what a coin dealer would pay for the entire collection, nor was the condition of the collection described, observed, or considered. However, after Hale received the price list from the dealer in Texas, he prepared a tabulation of all the medallions and assigned the retail market as approximated by the dealer as the actual value of each medallion. Hale did not allow anyone to verify either the quality or quantity of the medallions. Marie Smith Bennett, a former World-Wide employee whose responsibilities included receiving inventory purchased by the company, testified that Hale instructed her, contrary to normal policy, not to write a purchase order when the medallions were received. Hale ordered Bennett to initial tabulations of the medals that he had prepared that contained the "appraised" values, giving the impression that Bennett had inspected these medallions, allegedly valued at $225,000.[14]

By the time that the medallions became a part of World-Wide's inventory, only the gold and silver medallions, which were valued by Hale at approximately $30,000, had been sold for their scrap value. The remaining bronze medallions, which were valued by Hale at $195,000, have not been sold. May, Zima & Company (May, Zima), the independent auditors that prepared World-Wide's financial statements for its 1980 10K [15] did not accept the values that Hale placed on the bronze medallions, and, after obtaining the opinion of a third party numismatist, wrote down the value of the remaining medallions from $195,000 to $60,000. The director of advertising at World-Wide attempted, pursuant to Hale's instructions, to sell the remaining medallions, but the best offer that was given for the medallions was from 10 ¢ to 15 ¢ on the dollar or approximately $19,500. Thus, it appears that Hale overstated the value of the bronze medallions by $135,000 to $175,000, knowing that they were worth substantially less than $225,000.

It further appears that Seibert, who was a World-Wide director at the time Hale sold the medallions to the company, knew that Hale was not authorized to sell the medallions for 300,000 additional shares of common stock, knew that the medallions had not been appraised as required, and knew that the medallions were substantially overvalued since there was little, if any, market for them.

## II. HALE'S PUBLIC TENDER OFFER

On July 30, 1979, Hale commenced a tender offer to purchase the remaining common shares of World-Wide stock for 75¢ per share on or before September 27, 1979.[16] In connection with this tender offer, Hale directed World-Wide's transfer agent, the National Bank of Georgia, to mail an offering circular that he had per-

physically inspected by an experienced numismatist or coin dealer. Testimony of Clifford Haygood, Robert Nofal.

**13.** This letter is dated nearly nine months after the swap of stock for the medallions and after World-Wide acquired the medallions for its inventory.

**14.** Plaintiff's Exhibit Number 210 is a compilation of sheets containing tabulations of various

appraisal figures for the medallions, the last containing the tabulation of the total figures, indicating a total value of $225,000. Each page is initialled "M.S." for Marie Smith Bennett, who was unmarried at the time.

**15.** Plaintiff's Exhibit Number 59.

**16.** Plaintiff's Exhibit Number 40.

sonally prepared without the assistance of counsel to the remaining 401 shareholders of World-Wide. By way of this tender offer, Hale subsequently acquired approximately 10,000 additional shares from World-Wide public shareholders.

A review of the tender offer circular reveals omissions and misrepresentations in the following respects. (1) The circular stated that the board of directors unanimously approved the issuance of 300,000 new shares to Hale in exchange for cash or a combination of gold and silver coins and medals. The circular made no mention that there was some dispute regarding this swap of medallions for stock and made no mention of the requirement that the medallions be independently appraised. (2) The circular failed to state the effect that the issuance of 300,000 additional shares would have on the approximately 400 minority shareholders of World-Wide. (3) The circular failed to disclose Hale's purpose with respect to the tender offer, stating that he was an "investor," implying that he was making the tender offer for investment purposes only. (4) The circular failed to disclose the understanding between Hale, Hamrick, and others regarding the composition of the board of directors. (5) The circular stated that if the number of World-Wide shareholders became less than 300, the registration of its stock under the 1934 Securities Exchange Act could be terminated, when, in fact, in order for the company to terminate its Exchange Act reporting requirements, it would be necessary for the company to discontinue its registration on the Boston Stock Exchange as well. (6) The circular stated that Hale had filed the required Schedule 14D tender offer statement with the SEC when, in fact, he had not. (7) The circular stated that the sale of World-Wide Camera Fair would be completed within "a reasonable number of days" and that after the sale, a substantial portion of the company's debts would be eliminated since the company would obtain $100,000 in cash. Hale knew that this transaction would probably not be consummated, and, in fact, the transaction did not close. Within 45 days of the commencement of Hale's tender offer, however, the assets of Camera Fair were sold to John Hamrick, former president and controlling shareholder of World-Wide, and another person in a transaction different than discussed in the tender offer circular, at terms considerably less advantageous to World-Wide.

Although Robert Whitley had previously advised Hale as to the requirements under the federal securities laws with regard to tender offers, Hale did not make the necessary filings with the SEC. He was required to prepare and file a Schedule 14D form with the SEC, but he did not. He did file this form with the Boston Stock Exchange, but it contained virtually none of the required information. Furthermore, when Hale acquired the approximately 10,000 additional shares of stock pursuant to the tender offer from World-Wide shareholders, he should have filed a Form 4 with the SEC, but he did not. With respect to his failure to file these forms with the SEC, Hale testified at trial that it was true that he did not file a Form 4, but he did not think he had to. He testified he did not file a Form 3 in 1979 reflecting his total purchase of shares, stating that he owned some of the shares beneficially rather than directly, and therefore he did not consider it necessary to report this to the SEC. He admitted that he wrote the tender offer circular himself without any attorney's advice and testified that World-Wide had no lawyer on retainer until the initiation of this action.

### III. EVENTS FOLLOWING HALE'S TAKEOVER

Prior to Hale's obtaining control of the company in July 1979, the accounting firm of Kanes, Benator & Co. (Kanes, Benator) was retained as World-Wide's independent auditor and prepared the company's 10K

report for fiscal year 1979.[17] Also prior to the takeover, World-Wide apparently had an adequate system of internal accounting controls, since the company kept books and records which accurately reflected its transactions and dispositions of assets in reasonable detail. Furthermore, all employees followed internal control procedures, and the company had a policy of requiring supporting documents to be prepared for all transactions. It is the deterioration of World-Wide's internal controls and accounting procedures that constitutes the primary thrust of the SEC's complaint. The SEC contends that the combination of late filings, lack of internal controls, transactions unsupported by adequate documentation, and a total disregard for proper accounting procedures resulted in the precarious position of the company at the time the lawsuit was filed. This court will attempt to examine each of the various problems of the company from 1979 through 1981.

A. 1979 10K Report and Related Events

Soon after Hale acquired control of World-Wide, he terminated the chief financial officer of the company, and for the next month or so, the company's accounting books were virtually ignored. General ledgers and general journals were not kept, and the checks written on World-Wide's five checking accounts were not reconciled.

In early October 1979, Hale hired Patricia Allen as a bookkeeper to set up the books and to take full responsibility for maintaining the books and records of World-Wide. Another part of her responsibilities included preparing the 10Q reports to be filed with the SEC.[18] Ms. Allen was not a high school graduate; her only experience for this position consisted of five months of vocational school training and seven years of bookkeeping for a privately held lumber company.

The only other person in the company's accounting department was Seibert, the one-man audit committee, who was also Ms. Allen's theoretical supervisor. Seibert had no experience with a publicly held company such as World-Wide and in fact was not a paid employee of the company, since he was a full-time employee of Health Care, one of World-Wide's subsidiaries. As a result, he was rarely available to advise Ms. Allen on any bookkeeping matters.

On November 5, 1979, Kanes, Benator wrote a letter to Hale [19] following a routine, required evaluation of World-Wide's system

---

17. Plaintiff's Exhibit Number 58 is a 10K report, an annual report required to be filed pursuant to section 13(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78m, and 17 C.F.R. § 240.13a–1. It contains detailed certified financial statements on a comparative basis for the last two fiscal years of a company, as well as an earnings statement on a comparative basis for the past five years. A 10K report also includes extensive information pertaining to the properties of the issuer, its officers and directors, lines of business and a narrative description of material business developments during the past year. This requirement applies to every issuer having securities registered pursuant to section 12 of the 1934 Securities Exchange Act and the form must be filed within 90 days after the end of each fiscal year covered by the report.

18. 10Q reports are reports required to be filed pursuant to section 13(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78m(a) and Rules 12b–20, 13a–1, 13a–11, and 13a–13, 17 C.F.R. §§ 240.12b–20, 13a–1, 13a–11, and 13a–13. The purpose of a 10Q report is to disclose certain financial information occurring every quarter, including uncertified (although it may be certified) and condensed profit and loss statements, a balance sheet, and a statement of sources and application of funds. If the registrant disposes of any significant portion of its business during any period, the effect thereof on revenues and net incomes—total and per share—shall be disclosed for all periods. A Form 10Q also must disclose any change or substitution of assets securing any class of securities, describe any legal proceedings, changes in securities and analysis of the results of any operations explaining the reasons for changes. The form must be filed within 45 days after the end of each of the first three fiscal quarters. If the registrant makes available to its stockholders or otherwise publishes a financial statement containing the information required under this section, it may incorporate the information by reference in the 10Q form.

19. Plaintiff's Exhibit Number 30.

of internal controls, expressing grave concern over certain accounting procedures and lack of internal controls that Kanes, Benator considered to be detrimental to the company. In this letter, Kanes, Benator noted the following material weaknesses and conditions: (1) An evaluation of the company's internal controls during the period subsequent to the fiscal year ending July 31, 1979, disclosed that an adequate segregation of duties between employees was not properly maintained. One employee was posting the cash receipts journal, the disbursements journal, the general ledger, and the accounts receivable subsidiary ledger, filing all sales invoices, making bank deposits, reconciling bank statements, and issuing disbursement checks. (2) Numerous transactions recorded on the company books by general entries were not properly explained nor accompanied by readily available documentation. (3) The accounting records in general were not properly filed nor available for proper inspection. (4) The accounting and other staff familiar with the company's procedures were not available to assist the auditors at the requested or even at a prearranged time.

This letter from Kanes, Benator officially notified World-Wide of its deficiencies in its internal accounting controls and further stated that these deficiencies would be considered by Kanes, Benator in its examinations of the company's financial statements in the future. Even with this official notice that improvements were needed, Hale and Seibert did nothing to remedy the situation, and the criticisms of Kanes, Benator were virtually ignored. Kanes, Benator was dismissed as the company's auditor following this 1979 audit, and May, Zima & Co. was selected as the replacement on May 6, 1980. A form 8K disclosing this change was filed with the SEC on August 13, 1980, over two and a half months after it was due.

With respect to the 10K report [20] filed for fiscal year 1979, Hale, Seibert, and Jones prepared it themselves without the assistance of counsel, and it contained the following misrepresentations: (1) the report stated that "two new outside directors had been elected" to the company's board, and (2) the report stated that, in consideration of the additional 300,000 shares of common stock to Hale, $225,000 in additional equity in the form of inventory had been added to World-Wide. With respect to the statement concerning outside directors, neither Jones nor Seibert could have been considered outside directors, since they were, at that time, employees of Hale's other private corporations. Furthermore, Seibert and Jones were not "elected" to World-Wide's board of directors, since Hale simply appointed them to the board. With respect to the statement concerning the addition of $225,000 to World-Wide's equity, this court has already examined the fact that the commemorative medallions were not marketable because of their lack of intrinsic value and were worth substantially less than $225,000. These two statements were also contained in the company's 1980 10K report.

## B. 1980 10K Report and Related Events

The company's problems increased in 1980, mostly resulting from its chaotic bookkeeping practices and total disregard for an adequate internal control system. World-Wide's problems in this regard will be emphasized in the following subsection of this order; the focus of this subsection will be the misrepresentations and omissions contained in the 1980 10K report. May, Zima & Co., World-Wide's independent auditor for its 1980 10K report, declined to give an opinion with respect to the company's 1980 financial statements [21] stating:

[T]he company was advised of an uncertainty relating to a possible violation of

20. Plaintiff's Exhibit Number 281.

21. Plaintiff's Exhibit Number 59 (p. F–1) is May, Zima's report of its 1980 audit of World-Wide, which states that an opinion of the auditor is disclaimed. Robert Johnson, a certified public accountant and a securities partner at May, Zima, testified that there were four types of opinions that an auditor can render following a detailed examination of the company's internal controls systems and books and rec-

the provisions of the Foreign Corrupt Practices Act of 1977. The ultimate outcome of the implications of the violations of the federal act cannot be determined and no provision or any liability that may result has been made in the 1980 financial statements.

The company had significant deficiencies in internal controls including the lack of detailed records and certain supporting data which were not available for our examination. Therefore, we were not able to obtain sufficient evidence in order to form an opinion on the accompanying financial statements including whether the inventory at July 31, 1980 ($450,750) was stated at the lower of the cost or market or whether the detailed subscription revenue ($60,878) is an adequate estimate for the applicable liability. . . .

Because of the significance of the matters discussed in the preceding paragraphs, the scope of our work was not sufficient to enable us to express, and we do not express, an opinion on the accompanying financial statements and related schedules.

This 1980 10K report, also prepared by Hale and Seibert without assistance of counsel, indicated that the company was in the process of correcting the deficiencies in its internal accounting controls because of May, Zima's disclaimer opinion. It soon became apparent, however, that no substantive improvements were ever made.

In addition to the misrepresentations discussed above, a substantial amount of material was not disclosed in this 1980 10K: (1) The 10K failed to disclose that Hale was not supervising World-Wide's day-to-day operations of the company, although it did disclose that he was the president and chairman of the board. This should have been disclosed, since on or about August 1, 1980, Hale took over the control of Florafax, spending nearly all of his time in Tulsa, Oklahoma, being at World-Wide's offices no more than one or two days a month. Since that time until April 1981, Jones managed the operations of the company with the assistance of Seibert. (2) The report stated that World-Wide had purchased 42,000 shares of Florafax stock at a cost of over $164,000 and that Hale did not own controlling interest in Florafax at the time that World-Wide purchased the stock. The report did not disclose, however, that prior to World-Wide's initial investment in Florafax, Hale had purchased approximately 8% of its outstanding stock and that he was also making purchases of Florafax stock, intending to obtain control of the company. The report did not disclose that Florafax had been having financial problems since 1978 and that it was in need of cash. Furthermore, Florafax had not paid a dividend in over five years, but this was not disclosed in the 10K report. (3) The report contained certain statements with respect to the value of the medallions sold to the company in 1979, indicating that their value had decreased since Hale had sold them to the company; however, the truth was that Hale had knowingly overvalued them when they were first placed in World-Wide's inventory.

### C. Problems with Internal Controls and Accounting Procedures

On November 5, 1979, Kanes, Benator, as World-Wide's independent auditor, warned

---

ords: (1) an unqualified opinion, expressing no reservations about the company's financial operation, (2) a qualified opinion, stating that the auditor's opinion contains significant contingencies about the company's well-being, (3) an adverse opinion, stating that the company's financial statements do not represent a fair and accurate picture of the company, and (4) a disclaimer, stating that because of certain circumstances, including limited work opportunities, the auditor could not reach an opinion. The reasons for the disclaimer of World-Wide, according to Johnson, were that the company's internal controls and accounting methods had too many internal weaknesses, supporting documents and records were non-existent, inventory control was totally non-existent, there was a lack of qualified personnel running the business operations, and there was a failure to properly amortize receipts from subscriptions to *The Coin Wholesaler*. The problems with World-Wide's internal controls and accounting procedures are more fully discussed in part IV of this opinion.

Hale and World-Wide that a good and sound internal accounting control system was necessary to ensure the safeguarding of assets against losses from unauthorized use of dispositions and of financial records for preparing financial statements and maintaining accountability for assets. Although the company was notified of the importance of a good system of internal controls, this warning was ignored, and any control system that had existed at World-Wide ceased to exist. The problems that occurred at the company with respect to internal controls and accounting procedures can be divided into three areas: (1) inventory problems, (2) problems with separation of duties and the lack of documentation of transactions, and (3) problems with the books, records, and accounting procedures of the company.

### (1) Inventory Problems

The safeguarding of World-Wide's physical inventory was one of its most severe problems; there was considerable testimony at trial to the effect that the company's vault, where most of the rare coins were kept, was unguarded and left open all day to all employees. Furthermore, no one employee was responsible for the issuance of coins from the vault, according to the accountants from May, Zima, who performed the 1980 audit. Scrap silver and bags of silver coins were left unattended in the hallways and in several cluttered, unlocked rooms at World-Wide's offices. During the trial, Hale admitted that he was worried about thefts due both to faulty record-keeping and the system of safeguarding the assets.

Hale also failed to initiate an adequate system of itemizing World-Wide's physical inventory. Rather than maintaining a perpetual inventory system, the company relied on a manual quarterly system, which, in light of the company's inadequate securi-

ties measures, was not effective in safeguarding the assets or in keeping an accurate account of the inventory. World-Wide's system made it relatively simple for an employee to improperly value and/or misappropriate large items of inventory undetected. Furthermore, employees were allowed to take large amounts of inventory off the premises of World-Wide for purposes of effecting a sale without giving a receipt.

An accuration valuation of World-Wide's inventory was never accomplished, and Clifford Haygood, the accountant from May, Zima who performed the field work for the 1980 audit, testified that a major reason for the disclaimed opinion in 1980 was the inability to determine the valuation of the cost inventory. Haygood also testified that he was unable to determine the cost of inventory, since World-Wide failed to have adequate purchase orders as documentation to determine the correct cost.[22]

Haygood, along with Robert Nofal, a coin expert hired by May, Zima to determine the value of World-Wide's coin inventory, inspected the offices of World-Wide for approximately 4½ days beginning July 30, 1980. After Nofal's examination of the coins, Haygood concluded that the value of inventory by Hale required a substantial write-down of 10% of the value at which they were being carried on World-Wide's books. With respect to the $225,000 "appraisal" of the medallions involved in the 1979 stock swap, Haygood stated that no actual appraisal was ever done since the items were never actually physically inspected, which is necessary for an accurate appraisal.

Nofal testified that he could not determine how much was actually paid for the coins in World-Wide's inventory, since there were no backup documents and only a few

---

**22.** Under GAAP (generally accepted accounting principles), a company's inventory must be stated at the lower of cost price or market price. Since World-Wide had no records or purchase orders with respect to its inventory, Haygood was unable to determine the cost under either method.

coins were cost-coded.[23] Nofal further testified that there was no organization of the inventory and that the vault was open without a guard when he came into the store.

### (2) *Separation of Duties*

The lack of qualified personnel working in World-Wide's offices and the company's policy of allowing one individual to accomplish numerous transactions was another primary reason for May, Zima's disclaimed opinion, and was a major concern of Kanes, Benator in its letter of November 5, 1979. This court has previously noted the lack of supervision over the accounting department, managed by Patricia Allen, and her lack of expertise in the area. World-Wide maintains no separation of duties in the area of purchase and sales transactions, and valuation procedures for ending inventory. For instance, a single salesperson can do all the following tasks without supervision or review by another employer or officer: appraise a particular coin offered for purchase by a customer, purchase that coin with a check that the salesperson alone has drawn, count that same coin into inventory, value the coin for inventory purposes, and sell the coin to another purchaser.

Employees, none of whom was bonded, were also allowed to take large amounts of inventory off the company's premises for purposes of effecting a sale without giving a receipt, as well as being given cash to purchase the precious metals and coins at various locations, also without giving a receipt. Nor were employees required to write source documents relating to the purchase and sale of coins, bullion, and other inventory, making it impossible, as Haygood testified, to ascertain whether a particular inventory item had been sold at a profit or loss, or whether it had even been sold. Although pre-numbered invoices could have been used to help alleviate this problem, they were not; there was a complete lack of control over any retail counter-sales, and Haygood testified that he could not match cash coming in or out with the merchandise going out. The company apparently did have a daily report of cash coming in, but there was no record of items purchased or sold. Hale himself admitted that he told his employees to write down the sales of total bullion rather than writing receipts for individual coins.

Additionally, there were no procedures enforced with respect to writing checks; for instance, no system has been implemented to ensure that the purpose for which a check is written can be ascertained. Since employees have been allowed to write checks without noting the purpose of the transaction on the instrument or on any other document, source documents for most checks do not exist. All employees have had access to presigned checks, and there has been no dollar limit over which an employee cannot write a check. Furthermore, employees have not been required to get approval before writing a check. These policies have caused World-Wide to bounce over 100 checks since Hale took over the management of the company. Because of World-Wide's propensity for having their checks returned due to insufficient funds, the National Bank of Georgia, the company's transfer agent, requested World-Wide to close its account and take its business elsewhere.

Evidence introduced at trial further revealed that approximately $1.7 million worth of checks were written to Hale, his affiliates, or to cash, all without supporting documentation or any indication of the purpose of the checks. Hale testified that approximately $250,000 worth of these checks were repayments of loans he had personally made to the company, but he failed to introduce any executed promissory notes or any document to support that claim. The SEC also introduced various checks to and/or

---

**23.** Cost-coding is a form of internal control device used in the coin business; coins are marked with a special code indicating their purchase price and date of purchase. Nofal testified that this type of device is an excellent control over theft problems, which are prevalent in a business with a large inventory such as coins.

bills from local bars and restaurants written by Hale and reimbursed by either World-Wide or East Coast Coin. Numerous checks written to Hale on World-Wide's account were superimposed over purchase orders, supposedly as source documentation for the transactions.

### (3) *Books and Records*

The lack of qualified accounting personnel not only created problems with World-Wide's inventory but also resulted in completely inaccurate and incomplete books and records. World-Wide, Hale, and Seibert have failed to make and keep books, records, and accounts which accurately and clearly reflect the transactions and dispositions of World-Wide's assets. As discussed previously, World-Wide employees have not been required to write purchase orders or any source document relating to the purchase and sale of coins and bullion, rendering it impossible to arrive at an accurate count or valuation of the inventory.

During his inspection of World-Wide's offices, Haygood stated that the records of operations for Hale's subsidiaries, such as World-Wide Camera Fair, were scattered throughout the office and were not in any order. Although Haygood was aware of the existence of World-Wide Camera Fair following a review of Kanes, Benator's work papers from 1979, he stated that he was unsure about the documentation and the sale of other companies such as World-Wide Rare Metals and Chattanooga Coin and Stamp. With respect to this latter subsidiary, Haygood was unable to identify it as a separate and existing corporation since it had been merged into World-Wide's balance sheet, making it impossible to differentiate between the good will of World-Wide and that of Chattanooga Coin and Stamp. Furthermore, this failure to consolidate the subsidiaries into the form and financial statements rendered the 10Q reports incorrect for fiscal year 1980.

Haygood also testified the company's books were chaotic with respect to the deferred revenue received from subscriptions to the company newspaper, *The Coin Wholesaler.* There were no accurate records setting out the dates of subscriptions; therefore, the amount of deferred revenue simply had to be estimated on the company's books.

During May, Zima's inspection at the premises, on July 31, 1980, Haygood and other representatives from May, Zima met with Jones and Seibert to express their concern about the state of World-Wide's control procedures and accounting methods. Each item of concern was discussed in detail including questions from Seibert and Jones relative to the evaluation of the potential effects on the company and the continued trading of the common stock. May, Zima explained the position of Robert Nofal and offered to have a second opinion in order to confirm his initial evaluation that the grading policy and inventory values were significantly higher than was appropriate. Seibert and Jones acknowledged the problems noted and agreed that a totally separate inventory would be prepared by Nofal and later compared to the inventory prepared by the company's employee with appropriate reconciliation of differences in order to establish an acceptable, reasonable valuation of inventory. Robert Johnson, a partner at May, Zima, suggested that the company immediately obtain and consult with a securities attorney relative to the necessary action that should be taken as a result of the information May, Zima provided concerning its evaluation of the company's internal accounting control system and the effect on May, Zima's opinion. Johnson further indicated that there was a possible violation of the Foreign Corrupt Practices Act and that World-Wide should seek advice concerning that possibility. Johnson explained that the May, Zima would be willing to assist World-Wide through further discussions of these matters and/or offer suggestions to remedy the situations noted. Furthermore, Haygood offered to go to the Securities and Exchange Commission with the company to resolve their problems, but Seibert stated that he would rath-

er take his chances and not contact the SEC in the hope that the SEC would not contact him.

World-Wide eventually agreed to retain the law firm of Jones, Bird & Howell and met with Frank Bird of that firm on August 18, 1980. At that meeting, there was a discussion of how World-Wide should communicate to the SEC. Bird agreed that the disclosure should be made immediately and that a Form 8K should be filed on the report received from the company's auditors advising it of a possible problem with the provisions of the Foreign Corrupt Practices Act, a possible disclaimer of opinion on the company's financial statements and the effects on the company's estimated net income resulting from the write-off of investments and subsidiaries. Seibert agreed to draft a Form 8K to disclose these items and to make a press release on the revised estimated income.

Following the initial meeting on July 31, 1980, May, Zima wrote a letter to World-Wide on August 21, 1980, detailing the weaknesses noted in its system of internal accounting controls.[24] In this letter, May, Zima listed the following deficiencies: (1) a lack of supervision in the accounting department, (2) a lack of reliability in the bookkeeping department because of no supervision, (3) a lack of segregation of duties in the accounting department, emphasizing that the segregation of duties would allow for proper checks and balances in the company's accounting system, (4) a lack of control over retail counter sales in that there were no prenumbered invoices and the company could not match cash coming in with merchandise going out, (5) a lack of segregation of duties in the department of purchases and sales of coins, (6) the lack of determined value on some of the items of inventory such as the Coca-Cola memorabilia, (7) problems with "related-party" transactions (transactions between World-Wide and insiders or stockholders).

On October 22, 1980, May, Zima wrote a memorandum to the board of directors of World-Wide, setting forth certain recommendations of procedures which the accounting firm felt would improve and strengthen the company's present system. May, Zima suggested (1) a change in the company's system of cash received and disbursements, suggesting that a listing of mail receipts be prepared by the individual who opens the mail and compared to the bank deposit slip and amounts recorded in the cash receipts journal, (2) petty cash reimbursements should be drawn to the petty cash custodian and not to cash, (3) aging accounts receivable should be reviewed on a periodic basis by an appropriate official separate from the accounting department, (4) an improvement in the safeguarding of the assets of the company, and a provision for regular inspection of the assets, (5) routine procedures to be developed providing for prompt and adequate reporting to the accounting department of sales and/or disposals of property and equipment, (6) utilization of prenumbered inventory tags to facilitate accounting for, and control of, the inventory, (7) obtaining cancelled notes payable from creditors when paid, (8) the maintenance of personnel files for all employees and the rotation of the distribution of payroll checks among appropriate officials, (9) the bonding of employees who receive, disburse, or handle cash or who have access to assets and records, (10) full documentation of travel and entertainment expenses, and (11) a mathematical check for sales and vendor invoices.

Although notified of a possible violation of the Foreign Corrupt Practices Act and of severe problems in the company's internal controls system and accounting procedures, World-Wide did little, if anything, to change its methods of operation. Steve Watson, a staff accountant with the SEC, reviewed World-Wide's accounting records in September 1981 and concluded that there was still inadequate documentation to support purchases made and that the internal controls of the company were inadequate.

24. Plaintiff's Exhibit Number 33.

Watson indicated at trial that the company currently issues receipts for cash sales and has started taking quarterly inventories but that the controls of the company are still inadequate since there are no controls over the inventory itself. He further stated that he was unable to determine the cost of inventory in accordance with generally accepted accounting principles.

## IV. PROXY STATEMENT PROBLEMS

### A. March 1980

On or about March 31, 1980, World-Wide mailed to all World-Wide shareholders proxy soliciting materials, consisting of a proxy statement, an annual report, and a notice that the annual meeting would be held on May 6, 1980. The primary purpose of this mailing was to solicit proxies to elect directors to World-Wide's three-person board of directors. Greg Jones, neither a lawyer nor an accountant, prepared the material for mailing. Hale admitted at trial that these materials were not filed with the SEC but stated that he was unaware of a filing requirement or that he was required to disclose certain matters required by Schedule 14A. The SEC contends, and evidence presented at trial revealed, that these materials were replete with misrepresentations and omissions.

For instance, the proxy statement indicated that both Jones and Seibert were employed by International Systems, Inc. (ISI) and Health Care respectively and that they were not employed by World-Wide, creating the impression that they were "outside directors" and therefore able to exercise independent judgment with respect to corporate decisions. The statement did not disclose, however, that both ISI and Health Care were privately held companies wholly owned by Hale and doing business with World-Wide; since Jones and Seibert received no other income in addition to their salaries from these companies, they would not, as a practical matter, exercise the kind of independence that was expected from an outside director. The proxy statement further failed to disclose that Hale had appointed Jones and Seibert to the board as directors of World-Wide, rather than their being elected by the company's shareholders.

The annual report contained in the materials indicated that the net worth of World-Wide had increased substantially since year end but did not disclose that most of this increase was due to Hale's transfer of medallions to the company's inventory, upon which he had placed a value of $225,000 in return for 300,000 shares of stock.

The proxy material stated that no directors were paid compensation in excess of $40,000 annually, but there was no disclosure with respect to the compensation paid specifically to Hale, Jones, or Seibert as required by Items 6 and 7 of Schedule 14A of the SEC's proxy rules. Furthermore, it was not disclosed that Hale and ISI made substantial loans to World-Wide, which were never evidenced by promissory notes nor by any other supporting documentation. Furthermore, the materials failed to disclose the fact that Hale and his private companies effected numerous transactions with World-Wide. For example, Hale sold to World-Wide, in addition to the unmarketable commemorative bronze medallions, large amounts of bullion and rare coins.

The materials also failed to disclose that East Coast Coin Company, a privately held company owned by Hale, had been competing directly with World-Wide. Other omissions included the fact that Hale has received his monthly salary in the form of a consulting fee paid to J.H. International, one of Hale's privately held companies and the existence of a stock bonus arrangement, by which Jones received 2,000 shares of World-Wide stock.

### B. November 1980 Materials

On November 26, 1980, new proxy soliciting materials were filed with the SEC. These materials consisted of a proxy statement, another annual report dated Decem-

ber 5, 1980, and a notice that another annual meeting of shareholders would be held on December 23, 1980. (For unexplained reasons, this meeting was not held.) These proxy materials were not sent to World-Wide shareholders but were filed with the SEC as attachments to a Form 8K report, thereby becoming available to market analysts, advisors, and public investors.

This second set of proxy materials had many of the same misrepresentations and omissions of material information that constituted problems with the March 1980 materials. Furthermore, these November 1980 materials also failed to provide information with respect to the relationship of World-Wide's directors to Hale and with respect to the numerous transactions between World-Wide, Hale, and Hale's other companies. Furthermore, there were additional misrepresentations and omissions of material facts in this set of proxy materials.

For example, the materials stated that the company's excess funds were invested in the stock market, when, in fact, during the time that Hale was investing over $300,000 of World-Wide's money in the stock market, World-Wide had no excess funds, was bouncing checks, and was in dire need of capital. Notwithstanding its financial problems, Hale directed World-Wide to purchase 42,000 shares of Florafax stock at a cost of $164,000 and 28,600 shares of its own stock at a cost of approximately $113,-000. As previously discussed, Hale was acquiring control of Florafax during this time, an event which was not disclosed in the proxy soliciting materials.

### V. 1981 10K REPORT

Following the resignation of May, Zima as the company's auditors on May 6, 1981,

World-Wide retained the accounting firm of Main, Hurdman & Cranstoun (Main, Hurdman) to perform the field work for its 1981 audit. Main, Hurdman was retained to do a balance sheet audit [25] only, not a complete examination of the company's internal controls systems or the accuracy of the company's books and records as the two other accounting firms had performed. The 1981 10K report [26] filed by World-Wide on November 13, 1981, following Main, Hurdman's balance sheet audit, failed to disclose that the accounting firm was about to render a qualified opinion of the company's financial status.

Robert Johnson, a securities partner in May, Zima, testified at trial concerning the accuracy of the 1981 10K. He testified that the reason given in the 1981 10K for the failure to have an opinion by Main, Hurdman is false. The 10K states that Main, Hurdman was retained because of the disclaimed opinion of the 1980 audit by May, Zima; however, the true reason was that the firm had been hired merely for purposes of doing a balance sheet audit, which was not disclosed. Johnson also testified that there are significant differences between the 1981 10K filed November 13, 1981, and the Main, Hurdman report, rendered on September 15, 1981. Seibert contended that the company did not have the Main, Hurdman report at the time the 1981 10K was being prepared and that he simply used the 1980 10K report of the company as a guide. It is apparent, however, that World-Wide did have the Main, Hurdman report before the 10K report was filed, since many of the footnotes in the Main, Hurdman report with respect to specific figures are identical with those in the 10K report.[27]

Even though the company had the assistance of the Main, Hurdman balance sheet

---

**25.** Plaintiff's Exhibit Number 26.

**26.** Plaintiff's Exhibit Number 259.

**27.** For example, footnote number 8 (page 5) in the Main, Hurdman report concerning the company's long term debt is virtually identical to item 7 (page F–6) of the World-Wide 10K report. During the trial of this case, the defendants submitted a statement with respect to the

company's 1981 10K report in an attempt to rebut the SEC's allegation that World-Wide was in possession of the audit report when the 10K was prepared. Since the company was filing a balance sheet audit only, it had to obtain a variance from the SEC. While World-Wide was awaiting both the Main, Hurdman report and the SEC variance, it secured an extension of time until November 13, 1981, to

audit, the 1981 10K report failed to disclose significant items such as "accrued expenses"[28] and the purchase of a significant number of Rolex watches (discussed below), which Johnson stated should have been disclosed under the "related party transactions" portion of the 10K report. Although the 10K did state that there was a current fee dispute with May, Zima,[29] it did not disclose that World-Wide had filed a counterclaim seeking damages for breach of contract by the accounting firm. The 10K further failed to disclose the remuneration of the directors of the company, which Johnson stated was a very significant omission. Finally, the 10K [30] states that Main, Hurdman had rendered an opinion on the audit of the company's financial statements for fiscal year 1981, which was not true since Main, Hurdman had indicated in its letter to World-Wide [31] that the balance sheet audit was prepared on a going-concern basis only, which does not constitute an official opinion of the accounting firm.

With respect to the purchase of the Rolex watches, Hale testified that he purchased approximately 35 to 50 watches from Tiffany's in New York City, amounting to approximately $200,000 worth of watches (about $6,000 per watch). Hale had these watches sent to his father's address in Florida, who in turn sent them to Hale in Georgia, thus attempting to avoid state sales tax. Hale brought the watches into World-Wide's inventory, paid for them on World-Wide checks, and later repurchased them with his own personal checks or with gold bullion.[32] Steve Watson, the staff accountant for the SEC, testified that there were no records at World-Wide tying a specific watch to a specific sale and that there were numerous watches with absolutely no documentation. Watson concluded that World-Wide had paid approximately $150,000 for the watches, which retailed at approximately $250,000, and that only $98,000 had come back into the company. World-Wide's books and records do not indicate how payment for these watches was made or what the value of the discount amounted to; furthermore, it does not appear that the inventory of watches was ever listed as an asset of the company or that the debt for the watches was listed as a liability. This failure to include the Rolex watch transactions under the "related party transaction" portion of the 1981 10K was one of the major omissions of that report, according to May, Zima accountant Robert Johnson.

## VI. ADDITIONAL FAILURES TO FILE AND LATE FILINGS

As discussed previously in this opinion, when Hale was in the process of obtaining majority control of World-Wide, he failed to file the tender offer circular, Schedules

file its 10K report. Although Seibert, who prepared the 10K, did not see the report from Main, Hurdman before filing the 10K, it is clear that James Dykehouse orally informed him of the figures contained in Main, Hurdman's report and of certain statements contained in it, so that Seibert would be aware of any disclosures that should be made.

28. Item 5 (page 4) of the Main, Hurdman report, Plaintiff's Exhibit Number 260.

29. This fee dispute relates to the 1980 audit performed by May, Zima; although May, Zima had initially estimated that the cost of the audit would be approximately $10,000 to $15,000, because of the difficulty in examining World-Wide's books and records, having to hire an outside coin expert to assist in the valuation of the inventory, having to audit Hale's subsidiaries to render a more accurate audit, and other

problems which resulted in a disclaimer of opinion, the final fee was approximately $40,-000.

30. Plaintiff's Exhibit Number 259, Page F–1.

31. Plaintiff's Exhibit Number 260 (letter of September 15, 1981). Furthermore, James Dykehouse of Main, Hurdman had indicated to World-Wide prior to the filing of the 10K report that a qualified opinion would be issued. Testimony of James Dykehouse.

32. Plaintiff's Exhibit Number 26 is a schedule of World-Wide checks written for these Rolex watches from Tiffany Jewelers in New York City, showing that World-Wide paid approximately $244,000 for them.

13D, 14D–1 and two Form 4 reports with the SEC although he had had advice to do so from Robert Whitley, an experienced securities attorney. While he did file a Form 3 report with respect to his initial purchase of World-Wide stock, it was filed a month late. Furthermore, Seibert and Jones did not file Forms 3 and 4 when they acquired stock in World-Wide. World-Wide, under the direction and management of these three directors, failed to make disclosures pursuant to Section 14F of the 1934 Act and Rule 14F–1 when the majority of its board of directors changed hands without a vote of the shareholders, nor did the company file a Form 8K when there was a change in its control. In addition to these documents that should have been, but were not, filed with the SEC, World-Wide failed to file a Form 8K report with respect to (1) the purchase by Hale of the additional 300,000 shares in exchange for an estimated value of $225,000 for certain medallions and (2) the fact that during the fiscal year ending July 31, 1979, World-Wide's subsidiary World-Wide Camera Fair was responsible for much of World-Wide's sales and identifiable assets.

Furthermore, World-Wide was late in filing many of its other periodic reports. World-Wide's Form 10Q reports for the quarters ending October 31, 1979, January 31, 1980, and April 30, 1980, were received by the SEC approximately 30 to 60 days after they were due. A replacement for the 1979 auditors was chosen by the World-Wide shareholders on May 6, 1980, but the Form 8K disclosing this event was filed over two and a half months late. Form 8K reports are required to be filed within 15 days of the occurrence of the earliest event required to be reported. When May, Zima resigned as World-Wide's independent auditors on March 6, 1981, the company failed to file a timely Form 8K with respect to this event.

The SEC began its investigation of the company's activities in early 1981 and filed its complaint in August of 1981, seeking a full "fraud" accounting to trace the money that cannot be documented, a permanent injunction that would require the company to comply with the 1934 Securities Exchange Act, and return of any wrongfully received benefits to the company. Prior to the trial of this case, the defendants tendered a permanent undertaking to the court, admitting its failure to file certain reports and tardiness in filing other reports. In this undertaking, the defendants agreed that they would file timely 8K, 10Q, and proxy solicitations as required by the SEC rules. The defendants further stated that they would file, on a timely basis, any reports of initial beneficial ownership and reports of changes of beneficial ownership as required by the Commission, and Hale further stated that he would file statements on Schedules 13D and 14D–1 as required by the SEC. The defendants denied any wrongdoing with respect to the running of World-Wide.

With respect to the SEC's allegations of violations of the Foreign Corrupt Practices Act, 15 U.S.C. § 78m(b)(2) the defendants presented a cost/benefit argument, contending that a company the size of World-Wide should not be subjected to overly burdensome internal controls systems requirements, and accounting procedures, since compliance with such requirements would, as a practical matter, put small companies such as World-Wide out of business. The defendants further contend that the SEC's entire case concerned only technical violations of the 1934 Securities Exchange Act and its reporting requirements and that the non-disclosures and representations contained in the company's reports were not material.

## APPLICATION OF LAW

### I. FOREIGN CORRUPT PRACTICES ACT

The Foreign Corrupt Practices Act, 15 U.S.C. § 78m(b)(2) (Amend.1977) ("FCPA") was enacted by Congress as an amendment

to the 1934 Securities Exchange Act and was the legislative response to numerous questionable and illegal foreign payments by United States corporations in the 1970's. Although one of the major substantive provisions of the FCPA is to require corporate disclosure of assets as a deterrent to foreign bribes, the more significant addition of the FCPA is the accounting controls or "books and records" provision, which gives the SEC authority over the entire financial management and reporting requirements of publicly held United States corporations.

■ The FCPA was enacted on the principle that accurate recordkeeping is an essential ingredient in promoting management responsibility and is an affirmative requirement for publicly held American corporations to strengthen the accuracy of corporate books and records, which are "the bedrock elements of our system of corporate disclosure and accountability." [33] A motivating factor in the enactment of the FCPA was a desire to protect the investor, as was the purpose behind the enactment of the Securities Acts. It is apparent that investors are entitled to rely on the implicit representations that corporations will account for their funds properly and will not channel funds out of the corporation or omit to include such funds in the accounting system so that there are no checks possible on how much of the corporation's funds are being expended in the manner management later claims.[34]

Like the anti-fraud provisions of the 1934 Securities Exchange Act, the FCPA's provisions on accounting controls are short and deceptively straightforward. Section 13(b)(2) of the FCPA provides that every issuer having a class of securities registered pursuant to section 12 of the Exchange Act shall:

(a) Make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(b) Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that

(i) transactions are executed in accordance with management's general or specific authorization;

(ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

(iii) access to assets is permitted only in accordance with management's general or specific authorization; and

(iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

Moreover, SEC Regulation 13b2 was promulgated pursuant to section 13(b)(2) and is entitled "Maintenance of Records and Preparation of Required Reports," contains the following rules:

Rule 13b2–1: No person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act.

Rule 13b2–2: No director or officer of an issuer shall, directly or indirectly,

(a) make or cause to be made a materially false or misleading statement, or

(b) omit to state, or cause another person to omit to state, any material fact

---

**33.** Remarks of Senator Harrison Williams, 123 Cong.Rec. 519, 400 (Daily Edition Dec. 6, 1977), quoted in D. Goelzer, "The Accounting Provisions of the FCPA—The Federalization of Corporate Recordkeeping and Internal Control," 5 J.Corp.L. 1 (1979) (hereinafter "*Goelzer*").

**34.** Report of SEC on Questionable and Illegal Corporate Payments and Practices submitted to the Committee on Banking, Housing and Urban Affairs, United States Senate (May 12, 1976), reprinted in [1976] 353 Sec.Reg. & L.Rep. (BNA) 1.

necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with (1) any audit or examination of the financial statements of the issuer required to be made pursuant to this subpart or (2) the preparation or filing of any document or report required to be filed with the Commission · pursuant to this subpart or otherwise.

It is clear that section 13(b)(2) and the rules promulgated thereunder are rules of general application which were enacted to (1) assure that an issuer's books and records accurately and fairly reflect its transactions and the disposition of assets, (2) protect the integrity of the independent audit of issuer financial statements that are required under the Exchange Act, and (3) promote the reliability and completeness of financial information that issuers are required to file with the Commission or disseminate to investors pursuant to the Exchange Act.[35]

The accounting provisions of the FCPA will undoubtedly affect the governance and accountability mechanisms of most major and minor corporations, the work of their independent auditors, and the role of the Securities and Exchange Commission. The maintenance of financial records and internal accounting controls are major every-day activities of every registered and/or reporting company.[36] The FCPA also has important implications for the SEC, since the incorporation of the accounting provisions into the federal securities laws confers on the SEC new rulemaking and enforcement authority over the control and record-keeping mechanisms of its registrants. The FCPA reflects a congressional determination that the scope of the federal securities laws and the SEC's authority should be expanded beyond the traditional ambit of disclosure requirements. The consequence of adding these substantive requirements governing accounting control to the federal securities laws will significantly augment the degree of federal involvement in the internal management of public corporations.[37]

Since the FCPA became effective, the SEC has interpreted its authority to enforce the act's requirements quite broadly, taking the position that "it is important that issuers ... review their accounting procedures, systems of internal accounting controls and business practices in order that they may take any actions necessary to comply with the requirements contained in the Act."[38] The SEC has three basic tools to enforce the requirements of the FCPA: (1) judicial injunctions to prevent violations pursuant to section 21(d) of the 1934 Securities Exchange Act, 15 U.S.C. § 78u(d), (2) the ability to institute administrative proceedings to compel issuer compliance with the provisions of the FCPA or to discipline certain categories of persons who cause violations pursuant to section 15(c)(4) of the 1934 Act, 15 U.S.C. § 78o (c)(4), and Rule 2(e) of the SEC's Rules of Practice, 17 C.F.R. § 201.2e, and (3) the opportunity to refer the case to the Department of Justice for criminal proceedings.[39]

From 1977 to 1979, the SEC was primarily preoccupied with the prevention of the

---

**35.** *See* Securities Exchange Act release numbers 34–15570 (Feb. 15, 1979) and 34–17500 (Jan. 29, 1981), and Goelzer, *supra.*

**36.** American Bar Association Committee on Corporate Law and Accounting, A Guide to the New Section 13(b)(2) Accounting Requirements of the Securities Exchange Act of 1934, 34 Bus.Law. 307 (Nov.1978).

**37.** Goelzer, *supra,* at 5.

**38.** Securities Exchange Act release number 14478 (Feb. 16, 1978).

**39.** For an expanded and thorough comment on the SEC's enforcement powers under the FCPA, *see* J. Bagby, "Enforcement of the Accounting Standards in the Foreign Corrupt Practices Act," to be published in 21 Am.Bus. Law.J., No. 2 (Summer 1983).

foreign bribery provisions of the FCPA;[40] however, the thrust of its enforcement proceedings at present are with the section 13(b)(2) violations. The FCPA actions currently being litigated by the SEC indicate that it apparently intends to rely heavily on the Act to address management misfeasance, misuse of corporate assets and other conduct reflecting adversely on management's integrity. The instant case is the first action to be litigated throughout trial; most of the other cases have been settled prior to trial or have not been brought to trial.[41]

Section 13(b)(2) contains two separate requirements for issuers in complying with the FCPA's accounting provisions: (1) a company must keep accurate books and records reflecting the transactions and dispositions of the assets of the issuer, and (2) a company must maintain a reliable and adequate system of internal accounting controls. In applying these two separate requirements to the instant case, the court will examine the requirements of each provision and the problems inherent in their interpretation.

The "books and records" provision, contained in section 13(b)(2)(A) of the FCPA has three basic objectives: (1) books and records should reflect transactions in conformity with accepted methods of reporting economic events, (2) misrepresentation, concealment, falsification, circumvention, and other deliberate acts resulting in inaccurate financial books and records are unlawful, and (3) transactions should be properly reflected on books and records in such a manner as to permit the preparation of financial statements in conformity with GAAP and other criteria applicable to such statements.[42]

Congress' use of the term "records" suggests that virtually any tangible

---

40. *See SEC v. Textron, Inc.*, 539 Sec.Reg. & L.Rep. (BNA) A–2 (D.D.C. Jan. 31, 1980) (allegations of foreign bribery in addition to violations of recordkeeping requirements; *SEC v. Sam P. Wallace Co., Inc.*, 617 Sec.Reg. & L.Rep. (BNA) A–4 (D.D.C. Aug. 13, 1981) (allegation of foreign bribery, misleading misrepresentations in financial statements, proxy solicitations and 10K reports); *SEC v. McDonnell-Douglas Corp.*, 484 Sec.Reg. & L.Rep. (BNA) A–6 (D.D.C. Dec. 14, 1978) (allegation of foreign bribery and recordkeeping violations); *SEC v. Data Access Systems, Inc.*, No. 81–3362 (D.N.J.1981); and *SEC v. John E. Maquesee and Sheldon Lubitz*, No. 80–2289 (S.D.N.Y. May 6, 1980) (both alleging violations of SEC rules 13b2–1 and 13b2–2, but no allegation of foreign bribery); *In re: Playboy Enterprises, Inc.*, 567 Sec.Reg. & L.Rep. (BNA) A–1 (D.D.C. Aug. 13, 1980) (a section 15(c)(4) administrative hearing involving the failure to report and disclose massive perquisites).

41. *SEC v. Tortel, Inc.*, No. 81–0116 (W.D.Mo. Feb. 13, 1981) (recordkeeping and internal control inadequacies were alleged by the SEC to have caused falsification of financial statements. The case has not yet been tried or settled); *SEC v. Tiffany Industries*, 620 Sec. Reg. & L.Rep. (BNA) A–14 (E.D.Mo. Sept. 10, 1981) (Tiffany's former president has not settled this case but has consented to an injunction against future anti-fraud, reporting, accounting, and proxy violations); *SEC v. El Dorado International, Inc.*, 617 Sec.Reg. & L.Rep. (BNA) A–4 (D.D.C. Aug. 13, 1978) (injunctions were issued against further record-keeping, reporting and anti-fraud violations and the chairman of the board was ordered not to acquire additional stock, not to exercise any control over the corporation's affairs for four years and to return 83,000 shares to the corporation); *SEC v. Crown Cork and Seal Co.*, 620 Sec.Reg. & L.Rep. (BNA) D–1 (D.D.C. Sept. 2, 1981) (allegation of $5,000,000 in improper payments, failure to disclose new management; the defendant consented to an injunction and an order requiring it to seek customer confirmation of competitive allowances and director approval for loans to customer affiliates); *SEC v. Hermetite Corp.*, 14 Sec.Reg. & L.Rep. (BNA) 803 (D.D.C. April 4, 1982) (allegations of misuse of corporate assets and non-reporting of certain compensation of officers. The officers agreed to return $42,000 of the unauthorized compensation and the court consented to a permanent injunction prohibiting future violations of the FCPA's accounting provisions); *SEC v. Telex Corp.*, No. 34–18694 (D.Okla. April 29, 1982) (a section 15(c)(4) administrative proceeding alleging excessive perquisites to a section 13(b)(2) accounting controls provision violation. The company agreed to several "undertakings" to prevent similar reoccurrences).

42. A Guide to the New Section 13(b)(2) Requirements of the FCPA, 34 Bus.Law. 307 (1978).

embodiment of information made or kept by an issuer is within the scope of section 13(b)(2)(A) of the FCPA, such as tape recordings, computer print-outs, and similar representations. As indicated above, the purpose of this provision is to strengthen the accuracy of records and the reliability of audits.

During congressional consideration of the accounting provisions, there were numerous objections to the requirement that records be "accurate," which noted, for example, that inventories are typically valued on either the assumption that costs are recognized on a first-in, first-out basis or a last-in, first-out basis. Both of these theories, if correctly and honestly applied, produce "accurate" records, even though each may yield considerably different results in terms of the monetary value of inventories.[43] Several objecting groups recommended that the accuracy requirement be subject to a materiality test so that inaccuracies involving small dollar amounts would not be actionable. This view is not accepted, but Congress did make it clear that:

> The term "accurately" in the bill does not mean exact precision as measured by some abstract principle. Rather, it means that an issuer's records should reflect transactions in conformity with accepted methods of recording economic events.[44]

The only express congressional requirement for accuracy is the phrase "in reasonable detail." Although section 13(b)(2) expects management to see that the corporation's recordkeeping system is adequate and effectively implemented, how the issuer goes about this task is up to management; the FCPA provides no guidance, and this court cannot issue any kind of advisory opinion.

Just as the degree of error is not relevant to an issuer's responsibility for any inaccuracies, the motivations of those who erred are not relevant. There are no words in section 13(b)(2)(A) indicating that Congress intended to impose a scienter requirement, although there is some support among officials at the Securities and Exchange Commission for the addition of a scienter requirement and a form of a materiality standard to the FCPA.[45] Senate Bill No. 708, a proposal which would impose a scienter requirement on the accounting provisions of the FCPA, has met with substantial opposition in Congress, and it does not appear that it will be enacted as an amendment to the FCPA in the near future. The concept that the books and records provision of the Act embodies a scienter requirement would be inconsistent with the language of section 13(b)(2)(A), which contains no words indicating that Congress intended to impose such a requirement. Furthermore, either inadvertent or intentional errors could cause the misapplication or unauthorized use of corporate assets that Congress seeks to prevent. Also, a scienter requirement is inappropriate because the difficulty of proving intent would render enforcement extremely difficult. As a practical matter, the standard of accuracy in records will vary with the nature of the transaction involved.

The second branch of the accounting provisions—the requirement that issuers maintain a system of internal accounting controls—appears in section 13(b)(2)(B). Like the recordkeeping provisions of the Act, the internal controls provision is not limited to material transactions or to those above a specific dollar amount. While this requirement is supportive of accuracy and

---

**43.** Unlawful Corporate Payments Act of 1977, Hearings before the Subcommittee on Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess. 220 (1977).

**44.** S.Rep. No. 94–1031, 94th Cong., 2d Sess. 1976, reprinted in Goelzer, *supra,* at 23.

**45.** Statement of John S.R. Shad, Chairman, Securities Exchange Commission, before joint hearings of the Subcommittee on Securities and the Subcommittee on International Finance and Monetary Policy of the Senate Committee on Banking, Housing and Urban Affairs concerning S. 708 (June 16, 1981).

reliability in the auditor's review and financial disclosure process, this provision should not be analyzed solely from that point of view. The internal controls requirement is primarily designed to give statutory content to an aspect of management stewardship responsibility, that of providing shareholders with reasonable assurances that the business is adequately controlled.[46]

Internal accounting control is, generally speaking, only one aspect of a company's total control system; in order to maintain accountability for the disposition of its assets, a business must attempt to make it difficult for its assets to be misappropriated. The internal accounting controls element of a company's control system is that which is specifically designed to provide reasonable, cost-effective safeguards against the unauthorized use or disposition of company assets and reasonable assurances that financial records and accounts are sufficiently reliable for purposes of external reporting.[47] "Internal accounting controls" must be distinguished from the accounting system typically found in a company. Accounting systems process transactions and recognize, calculate, classify, post, summarize, and report transactions. Internal controls safeguard assets and assure the reliability of financial records, one of their main jobs being to prevent and detect errors and irregularities that arise in the accounting systems of the company. Internal accounting controls are basic indicators of the reliability of the financial statements and the accounting system and records from which financial statements are prepared.[48]

Among the factors that determine the internal accounting control environment of a company are its organizational structure, including the competence of personnel, the degree and manner of delegation and responsibility, the quality of internal budgets and financial reports, and the checks and balances that separate incompatible activities. The efficiency of the internal control system of a company cannot be evaluated without considering the company's organizational structure, the caliber of its employees, the strength of its audit committee, the effectiveness of its internal audit operation, and a host of other factors which, while not part of the internal control system itself, have an impact on the function of the system.[49]

■ Although not specifically delineated in the Act itself, the following directives can be inferred from the internal controls provisions: (1) Every company should have reliable personnel, which may require that some be bonded, and all should be supervised. (2) Account functions should be segregated and procedures designed to prevent errors or irregularities. The major functions of recordkeeping, custodianship, authorization, and operation should be performed by different people to avoid the temptation for abuse of these incompatible functions. (3) Reasonable assurances should be maintained that transactions are executed as authorized. (4) Transactions should be properly recorded in the firm's accounting records to facilitate control, which would also require standardized procedures for making accounting entries. Exceptional entries should be investigated regularly. (5) Access to assets of the company should be limited to authorized personnel. (6) At reasonable intervals, there should be a comparison of the accounting records with the actual inventory of assets, which would usually involve the physical taking of inventory, the counting of cash, and the reconciliation of accounting records with the actual

---

46. Goelzer, *supra* at 24.

47. SEC ruling ¶ No. 82,815, reprinted in 36 Bus. Law. 3 (April 1981).

48. J. Bagby, "SEC Prosecutions of Internal Accounting Control Violations," unpublished paper presented at the annual meeting of the Tri-State Business Law Association, Notre Dame University, South Bend, Indiana, April 15, 1983.

49. Goelzer, *supra,* at 28.

physical assets. Frequency of these comparisons will usually depend on the cost of the process and upon the materiality of the assets involved.

The main problem with the internal accounting controls provision of the FCPA is that there are no specific standards by which to evaluate the sufficiency of controls; any evaluation is inevitably a highly subjective process in which knowledgable individuals can arrive at totally different conclusions. Any ruling by a court with respect to the applicability of both the accounting provisions and the internal accounting control provisions should be strictly limited to the facts of each case.

The defendants in the instant case contend that the SEC has misconstrued the provisions of the FCPA relating to a knowledge requirement, contending that the SEC must show scienter. The defendants further state that the SEC does not allege a knowing attempt to circumvent for an improper purpose an internal control system required by law and that the complaint ignores all considerations of the costs and benefits of internal accounting controls and seeks to require World-Wide to maintain a system of controls that would destroy the company.

The definition of accounting controls does comprehend reasonable, but not absolute, assurances that the objectives expressed in it will be accomplished by the system. The concept of "reasonable assurances" contained in section 13(b)(2)(B) recognizes that the costs of internal controls should not exceed the benefits expected to be derived. It does not appear that either the SEC or Congress, which adopted the SEC's recommendations, intended that the statute should require that each affected issuer install a fail-safe accounting control system at all costs. It appears that Congress was fully cognizant of the cost-effec-

tive considerations which confront companies as they consider the institution of accounting controls and of the subjective elements which may lead reasonable individuals to arrive at different conclusions. Congress has demanded only that judgment be exercised in applying the standard of reasonableness. The size of the business, diversity of operations, degree of centralization of financial and operating management, amount of contact by top management with day-to-day operations, and numerous other circumstances are factors which management must consider in establishing and maintaining an internal accounting controls system. However, an issuer would probably not be successful in arguing a cost-benefit defense in circumstances where the management, despite warnings by its auditors or significant weaknesses of its accounting control system, had decided, after a cost benefit analysis, not to strengthen them, and then the internal accounting controls proved to be so inadequate that the company was virtually destroyed.[50] It is also true that the internal accounting controls provisions contemplate the financial principle or proportionality— what is material to a small company is not necessarily material to a large company.

This court has already declined to adopt the defense offered by the defendants that the accounting controls provisions of the FCPA require a scienter requirement. The remainder of World-Wide's defense appears to be that such a small operation should not be required to maintain an elaborate and sophisticated internal control system, since the costs of implementing and maintaining it would financially destroy the company. It is true that a cost/benefit analysis is particularly relevant here, but it remains undisputed that it was the lack of any control over the inventory and inadequate accounting procedures that primarily contributed to World-Wide's demise. No

---

**50.** *See* A Guide to the New Section 13(b)(2) Provisions of the FCPA, 34 Bus.Law. at 319 (Nov.1978).

organization, no matter how small, should ignore the provisions of the FCPA completely, as World-Wide did. Furthermore, common sense dictates the need for such internal controls and procedures in a business with an inventory as liquid as coins, medals, and bullion.

■ The evidence in this case reveals that World-Wide, aided and abetted by Hale and Seibert, violated the provisions of section 13(b)(2) of the FCPA. As set forth in the factual background portion of this order, the internal recordkeeping and accounting controls of World-Wide has been sheer chaos since Hale took over control of the company. For example, there has been no procedure implemented with respect to writing checks: employees have had access to presigned checks; source documents were not required to be prepared when a check was drawn; employees have not been required to obtain approval before writing a check; and, even when a check was drawn to "cash," supporting documentation was usually not prepared to explain the purpose for which the check was drawn. In addition to extremely lax security measures such as leaving the vault unguarded, there has been no separation of duties in the areas of purchase and sales transactions, and valuation procedures for ending inventory. Furthermore, no promissory notes or other supporting documentation has been prepared to evidence purported loans to World-Wide by Hale or by his affiliate companies.

Since Hale obtained control of World-Wide, employees have not been required to write source documents relating to the purchase and sale of coins, bullion, or other inventory. Because of this total lack of an audit trail with respect to these transactions and the disposition of World-Wide's assets, it has been virtually impossible to determine if an item has been sold at a profit or at a loss. Furthermore, there are more than $1,700,000 worth of checks drawn to Hale or to Hale's affiliates, or to cash, for which no adequate source docu-

mentation exists. Furthermore, Hale and Seibert knew that the medallions that were sold to World-Wide by Hale in 1979 were overvalued and unmarketable. Even so, they allowed the incorrect value of the medallions to be entered on the books of World-Wide. They also knew that the company's books and records were neither accurate nor complete. Pursuant to their directives, source documents were not prepared with respect to the transfer of funds; additionally, no audit trail was maintained for the acquisition and disposition of inventory. Furthermore, it appears that there were numerous false and misleading statements and omissions in the company's numerous reports to the SEC, many of which were filed late or not at all.

Individually, the acts of these defendants do not appear so egregious as to warrant the full panoply of relief requested by the SEC nor to impose complete liability under the FCPA. However, the court cannot ignore the all-pervasive effect of the combined failure to act, failure to keep accurate records, failure to maintain any type of inventory control, material omissions and misrepresentations, and other activities which caused World-Wide to decrease from a company of 40 employees and assets over $2,000,000 to a company of only three employees and assets of less than $500,000. It is evident that World-Wide, Hale, and Seibert violated all provisions contained in section 13(b)(2)(A) and (B) and the SEC's rules promulgated thereunder.

## II. SECTION 10(b) and RULE 10b–5 VIOLATIONS

■ Section 10(b) of the 1934 Securities Exchange Act and Rule 10b–5 promulgated thereunder, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5, make it unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security

to employ any device, scheme or artifice to defraud, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to

make the statements made, in the light of the circumstances under which they were made, not misleading, or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

In order to establish a prima facie case of a section 10(b) and Rule 10b–5 violation, the SEC must demonstrate that the defendants engaged in material misrepresentations or omissions in their various reports to the SEC and to stockholders and that they acted with scienter. Under section 10(b) and Rule 10b–5, the test for materiality is whether there is a substantial likelihood that under all circumstances, a reasonable shareholder would consider the omitted or misstated information significant in deciding upon his course of action. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *SEC v. Carriba Air, Inc.,* 681 F.2d 1318 (11th Cir. 1982); *SEC v. Blatt,* 583 F.2d 1325 (5th Cir.1978). Furthermore, the SEC is required to establish scienter as an element of a section 10(b) and Rule 10b–5 violation. *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 1980, 64 L.Ed.2d 611. *See also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter may be established by a showing of knowing misconduct or severe recklessness. *SEC v. Carriba Air, Inc., supra.* The standard in this circuit was set out in *SEC v. Southwest Coal and Energy Co.,* 624 F.2d 1312, 1321 (5th Cir.1980):

> Proof of recklessness would require a showing that the defendant's conduct was an extreme departure of the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

The evidence at trial reveals that the defendants have been perpetrating a continuing, fraudulent course of business over a two-year period on those persons who have been trading in World-Wide common stock through the Boston Stock Exchange and over-the-counter sales. These investors, as well as market analysts, brokers, and dealers have relied upon information filed with the SEC and the Boston stock exchange, who have been provided information by the defendants which is false and misleading. The defendants' violative conduct has occurred in connection with the purchase and sale of a security, since the information was disseminated in a manner reasonably calculated to influence the investing public. *See SEC v. Texas Gulf Sulpher Co.,* 401 F.2d 833 (2d Cir.1968). The SEC has demonstrated three separate instances of fraudulent conduct perpetrated by World-Wide and the individual defendants that establishes a section 10(b) and Rule 10b–5 violation: (1) Hale's acquisition of 10,000 shares of stock by his public tender offer, which contained false and misleading material information, (2) Hale's additional acquisition of 300,000 World-Wide shares of stock obtained in exchange for overvalued commemorative medallions, and (3) the false entry in the World-Wide corporate minute book concerning director approval of the stock/medallion swap.

As more fully discussed in part II of the factual background portion of this order, Hale commenced a tender offer on July 30, 1979, to purchase the remaining common shares of World-Wide stock for 75¢ per share. The offering circular that was sent to the shareholders in connection with this tender offer contained numerous misrepresentations and omissions, discussed above. These omissions and misrepresentations would have been significant to a reasonable shareholder in deciding whether to sell his shares of stock; therefore, the materiality requirement of section 10(b) and Rule 10b–5 is met. Furthermore, Hale, assisted by Seibert and World-Wide, knowingly omitted certain facts and misstated other facts in the tender offer and circular, thus establishing the scienter requirement of section 10(b) and Rule 10b–5.

The other two instances of fraudulent conduct relate to the swap of stock for

medallions, which occurred on September 15, 1979. As discussed above in part I of the factual background portion of this order, Hale valued these commemorative medals at $225,000, although the testimony at trial revealed that this figure was extremely inflated. Furthermore, the evidence revealed that approval for this swap was expressly conditioned on Hale's obtaining an outside appraisal of the medallions, which was never accomplished. Furthermore, the evidence revealed that the entry in the corporate minute book stating that the directors approved the swap of medallions for stock was falsified, since there was extensive testimony that no action or vote was taken by the board of directors with respect to this proposal. This conduct by Hale, abetted by Seibert and World-Wide, was knowing, reckless, and material as required by section 10(b) and Rule 10b–5. This information is of the type that should have been disclosed to World-Wide shareholders; as a result of Hale's actions regarding this stock swap and tender offer circular, more investors invested in World-Wide than would have had the true facts about these transactions been made known to them.

## III. VIOLATIONS OF THE PROVISIONS OF THE WILLIAMS ACT

■ The Williams Act was enacted as an amendment to the 1934 Act, primarily consisting of sections 13(d), 14(d)(1), 14(e), and 14(f), 15 U.S.C. §§ 78m(d), 78n(d)(1), 78n(e), and 78n(f). The purpose of the Williams Act is one of protecting the individual investor by requiring the disclosure of material information relevant to the potential impact of a possible acquisition of shares or a tender offer and to allow an investor sufficient time within which to make an informed investment decision. In enacting the Williams Act, Congress sought to protect the investor not only by furnishing him with the necessary information but also by withholding from the management or the bidder any undue advantage that could frustrate the exercise of an informed choice. *Edgar v. Mite Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *Great Western United Corp. v. Kidwell,* 577 F.2d 1256 (5th Cir.1978).

Hale's acquisition of the control of World-Wide and his subsequent tender offer were replete with violations of the Williams Act and are discussed below.

### A. Violation of Section 13(d) and Rule 13d–1

■ After Hale acquired 51% of the World-Wide common stock, he was required by section 13(d) of the 1934 Act, 15 U.S.C. § 78m(d) and Rule 13d–1 thereunder, 17 C.F.R. § 240.13d–1, to file a Schedule 13D with the SEC and the Boston Stock Exchange. A Schedule 13D disclosure is designed to keep the investor and public informed about potential changes in corporate management and control and thus enable him to evaluate adequately a company's worth. Although a Schedule 13D filing need not disclose plans which are contingent or indefinite, *see Saunders Leasing System, Inc. v. Societe Holding Gray D'Albion S.A.,* 507 F.Supp. 627 (N.D.Ala.1981), all material facts relevant to a reasonable shareholder's investment decision must be disclosed. As discussed in footnote 5, a Schedule 13D requires disclosure of all material information relevant to a possible change in control of the company, changes in the management, business or corporate structure of the company, and any contracts, arrangements or understandings the issuer may have with any persons with respect to the issuers. Furthermore, copies of all written agreements, such as consulting agreements, relating to the proposed acquisition of shares must be filed as exhibits to a Schedule 13D.

■ Hale was advised by Robert Whitley, an experienced securities attorney, about his reporting responsibility under the Williams Act; however, he failed to file a Schedule 13D with the SEC or with the Boston Exchange, which was a violation of

section 13(d) of the 1934 Securities Exchange Act and Rule 13d–1 thereunder.

### B. Violations of Sections 14(d)(1) and 14(e) and Rules 14d–3 and 14d–6

On July 30, 1979, Hale commenced a tender offer to purchase the remaining common shares of World-Wide stock for 75¢ per share. In connection with this tender offer, Hale mailed an offering circular that he had personally prepared without the assistance of counsel to the remaining 401 shareholders of World-Wide. Following this tender offer, Hale acquired approximately 10,000 additional shares from World-Wide's public shareholders. In connection with this offering circular, Hale was required, pursuant to section 14(d)(1) and Rules 14d–3 and 14d–6 thereunder, 15 U.S.C. §§ 78n(d)(1), 17 C.F.R. §§ 240.14d–1 and 14d–6, to file a Schedule 14D–1 with the SEC and with the Boston Stock Exchange.

■ Schedule 14D, as discussed in footnote 7, is a form required to be filed with any tender offer subject to the 1934 Act. The purpose of this requirement of the Williams Act is similar to section 13(d), discussed above, that of insuring that public shareholders, who are confronted by cash tender offers for their stock, will not be required to respond without adequate information. *See Piper v. Chris Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). Hale failed to file a Schedule 14D–1 with the SEC as required by the Act, and although he did file a purported Schedule 14D–1 with the Boston Stock Exchange, it contained virtually none of the information required. Although Hale did not file any documents with the SEC with respect to his tender offer, he did direct the National Bank of Georgia, World-Wide's transfer agent, to mail an offering circular to the remaining 401 shareholders of the company, which was replete with numerous misrepresentations and omissions of material information.

■ As is true with the materiality standard required under section 10(b) of the 1934 Act, the SEC must show that the omissions and misrepresentations contained in the Schedule 14D–1 were material. Materiality under the Williams Act provisions requires a showing of the substantive likelihood, under all the circumstances, that the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder. *TSC Industries, Inc. v. Northway, Inc., supra; SEC v. Mize,* 615 F.2d 1046 (5th Cir.1980). The evidence at trial revealed that Hale's tender offer and circular clearly misled World-Wide shareholders with respect to information that undoubtedly would have assumed significance in their decision whether to tender their shares or to remain a minority shareholder in a company dominated by Hale.

In his offering circular, Hale failed to disclose that the incumbent board of directors of World-Wide, which contained no less than four "outside directors," either had resigned or expected to resign and that Hale planned to appoint new directors. Moreover, he failed to disclose the plan that he had with respect to the composition of his new board, a plan which should have been disclosed to the shareholders indicating that substantial changes in World-Wide's management were eminent. The circular was also misleading with respect to the sale of World-Wide Camera Fair, since the circular stated that the sale of Camera Fair would be completed within "a reasonable number of days," that, because of the sale, a substantial portion of World-Wide's debt would be eliminated, and that World-Wide would obtain $100,000 in cash. This transaction did not close, and Hale knew that it probably would not be consummated. Within 45 days of the commencement of Hale's tender offer, Camera Fair's assets were sold in a completely different transaction to John Hamrick and others at less than book value, and the consideration received from the sale was insufficient to pay off Camera Fair's liabilities.

The circular further misrepresented World-Wide's financial condition by failing

to disclose the nature of Hale's swap of overvalued and unmarketable commemorative medallions for 300,000 shares of stock. The impression given by the tender offer circular was that highly liquid assets were to be transferred to World-Wide and, accordingly, the financial condition of the company would be highly improved. The reality was that the transfer of the medallions, which were not liquid, added very little to the net worth of the company, since they were extremely overvalued. Furthermore, the 300,000 additional shares issued to Hale significantly diluted the value of the stock of World-Wide's public shareholders. Accurate representations regarding the financial condition of World-Wide and the potential value of its stock would have been significant information to a reasonable shareholder.

Furthermore, the terms and conditions of the consulting agreement entered into on July 24, 1979, between Hale and Hamrick were never fully disclosed in the offering circular. Those transactions were clearly material information that should have been disclosed to World-Wide's investors, since such disclosure was specifically required by items 6 and 7 of Schedule 13D and by items 7 and 9 of Schedule 14D–1.

The circular also represented that Hale had filed a Schedule 14D–1 with the SEC, although he had made no such filing, in violation of section 14(e) of the 1934 Securities Exchange Act, 15 U.S.C. § 78n(e). That section provides that it is unlawful for any person to make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, defective, or manipulative acts or practices, in connection with any tender offer.

This tender offer circular clearly misled the investors of World-Wide with respect to information that was material in their deliberation whether to tender their shares to Hale. This information concerned the imminent change in management at World-Wide, the company's true financial condition, the value of its stock, Hale's dealings with Hamrick, and Hale's future plans for World-Wide. The evidence at trial clearly revealed that Hale violated section 14(e) of the 1934 Securities Exchange Act.

### C. Violations of Section 14(f) and Rule 14f–1

As discussed in footnote 9, section 14(f) of the 1934 Act, 15 U.S.C. § 78n(f), and Rule 14f–1, 17 C.F.R. § 240.14f–1, require an issuer to file with the SEC and send to all voting shareholders certain information prior to the election or designation of a majority of the board. When Hale obtained 51% of World-Wide stock, there was an understanding that the incumbent board of directors would resign and that Hale would designate his own board. The shareholders of World-Wide and the SEC should have been informed that the entire incumbent board of directors of World-Wide had resigned and that Hale planned to appoint two employees of his other private corporations, Jones and Seibert, to the board. This disclosure would have informed the public shareholders of World-Wide that, as a practical matter, the new board would not be able to exercise the type of independent judgment that could be expected from outside directors and that Hale would be making the decisions with respect to corporate policy and operations. Since World-Wide failed to make this disclosure, the shareholders were not permitted to evaluate the changing nature of their investment. Furthermore, World-Wide, as the registrant, was principally responsible for the violation. Hale, as chairman of the board of directors, was responsible for the company's reporting obligations and therefore aided and abetted the company's violations of section 14(f) and Rule 14f–1. Seibert, upon his appointment to the board of directors, assumed responsibility for the company's reporting obligations and therefore aided and abetted World-Wide's violations of section 14(f) and Rule 14f–1.

## IV. VIOLATION OF THE PROXY SO-LICITATION RULES OF SECTION 14(a) OF THE 1934 EXCHANGE ACT AND RULES 14a–6 and 14a–9

Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a) states:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title.

■ The rules promulgated by the SEC pursuant to section 14(a), Rule 14a–6 and 14a–9, 17 C.F.R. §§ 240.14a–6, 14a–9, were promulgated to ensure full disclosure regarding proxy solicitations. Any person soliciting the proxy of a holder of securities must fully disclose all material relevant to his proposed purchase of stock and may not make any false or misleading statements, such as predictions as to the specific market value. Rule 14a–6 requires that five preliminary copies of the proxy statement be filed with the SEC at least 10 days prior to the date copies are first sent or given to the security holders and requires eight copies of the proxy statement to be filed with or mailed for filing to the SEC no later than the date the material is first sent or given to the security holders. World-Wide did not file any copies of the proxy solicitating materials with the SEC that were mailed to the World-Wide shareholders on or about March 31, 1980.

■ Rule 14a–9 states that no proxy solicitation shall be made which is false or misleading with respect to any material fact or which omits to state any material fact. As discussed in the factual back-ground portion of this order, the proxy soliciting materials mailed to World-Wide shareholders on or about March 31, 1980, contained numerous misleading statements and omissions of material facts, which are in violation of Rule 14a–9.

These problems are set out in detail above, but a summary of the omissions is necessary here. The materials failed to disclose that Hale was affiliated with ISI and Health-Care and that Seibert and Jones were affiliated with these companies as employees, receiving nearly all their income from their positions. The impression given to the shareholders was that Jones and Seibert were outside directors who could exercise independent judgment with respect to World-Wide's corporate policy. This omission regarding Hale's affiliation with other companies was material information that World-Wide shareholders had a right to know. *Scott v. Multi-Amp Corp.,* 386 F.Supp. 44 (D.N.J.1974).

Furthermore, the proxy material failed to disclose the amount of transactions that took place between Hale, his affiliates, and World-Wide, including sales to East Coast Coin of large amounts of bullion, loans by Hale and his affiliates to World-Wide of over $500,000, the fact that World-Wide's employees were covered by an ISI group health insurance policy, and the fact that East Coast Coin was in direct competition with World-Wide. These omissions were omissions of material facts and should have been disclosed to World-Wide's shareholders. *Gladwin v. Medfield,* 540 F.2d 1266 (5th Cir.1976).

Furthermore, World-Wide's financial condition, which included severe cash flow problems, was not mentioned in the proxy materials, an occurrence which should have been disclosed to the public shareholders. The materials also stated that the net worth of the company had increased substantially since year end, although it was not disclosed that most of the purported increase was due to Hale's transfer of the unmarketable medallions into the inventory

of World-Wide, which had an inflated appraisal value of $225,000.

Therefore, the proxy solicitation materials that were sent out to the World-Wide shareholders were misleading with respect to the composition, independence, competence, and effectiveness of the company's board as well as with respect to the financial condition of the company.

## V. VIOLATIONS OF SECTION 16(a) and RULE 16a–1 OF THE 1934 SECURITIES EXCHANGE ACT

Section 16(a) of the 1934 Act, 15 U.S.C. § 78p(a), and Rule 16a–1, 17 C.F.R. § 240.-16a–1, require every person who beneficially owns, directly or indirectly, more than 10% of a class of equity securities, or who is a director or an officer of the issuer of such security, to file an initial report disclosing the amount of each class of the issuer's equity securities which are beneficially owned by such person at the time a person becomes such a director, officer, or beneficial owner. Subsequently, each person must report any change in his beneficial ownership of the securities within ten days after the end of each calendar month during which any change occurs.

The initial report form, designated as Form 3 (discussed in footnote 8), must be filed within ten days after a person becomes the beneficial owner of more than 10% of the registered class of equities security or becomes a director or issuer of such security. Any changes in this beneficial ownership must be reported on a Form 4 (also discussed in footnote 8).

The enactment of section 16 of the 1934 Act was a consequence of prior insider trading abuses and the purpose of section 16 is to require disclosure of the corporate holdings of officers and directors and stockholders owning more than 10% of any class of stock of a company, as well as requiring prompt disclosure of any changes that occur in their corporate holdings.

Hale did file a Form 3 report with the SEC, although late, when he acquired 51%

of the stock from Hamrick. However, he has not filed a single Form 4 report, although such a report should have been filed with the SEC upon the consummation of each of his purchases of World-Wide stock. Seibert was also required to make Forms 3 and 4 filings with the SEC but did not. These failures to file the required Forms 3 and 4 are violations of section 16(a) and Rule 16a–1. *SEC v. IMC International, Inc.*, 384 F.Supp. 889 (N.D.Tex.1974), *aff'd*, 505 F.2d 733 (5th Cir.1974).

 Furthermore, World-Wide, through its three-person board of directors, was aware of the continuous failures by each of these directors to disclose their beneficial ownership and changes in beneficial ownership of the company stock. Therefore, World-Wide aided and abetted these violations of section 16(a) and Rule 16a–1.

## VI. VIOLATION OF THE PERIODIC REPORTING PROVISIONS OF SECTION 13(a) OF THE 1934 SECURITIES EXCHANGE ACT AND RULES 12b–20, 13a–1, 13a–11 and 13a–13

 Under section 13(a) of the 1934 Exchange Act, 15 U.S.C. § 78m(a), every issuer of a security registered on the national securities exchange must file certain information and reports which the SEC prescribes as necessary. These reports include annual reports on Form 10K pursuant to Rule 13a–1, quarterly reports on Form 10Q pursuant to Rule 13a–13 and current reports on Form 8K disclosing certain corporate developments pursuant to Rule 13a–11. Rule 12b–20 adds the other requirement that other material information must be disclosed as necessary to make the required statements.

These reporting requirements were designed to ensure that investors receive adequate information upon which to base their investment decisions. These reporting requirements are a crucial element in the federal government's efforts to maintain the integrity of the nation's financial mar-

kets. Furthermore, Walter Cummings, secretary of the Boston Stock Exchange, testified at trial that these forms were very important for the investing public since brokers at stock exchanges must rely on the integrity of the reports filed with the SEC. He testified that any false or incomplete reports have an adverse effect on the marketplace. Herbert Frost, the director of research and analysis at Robinson-Humphrey Company, testified at trial regarding the importance of these SEC documents analyzing stocks, stating that forms such as Forms 8K and 10K are extremely important in market analysis of stocks and that he always examines them before giving any opinion regarding the net worth of a company.

From the date Hale obtained control of World-Wide to the time of trial the periodic reports filed by the company with the SEC contained numerous misrepresentations and omissions of material facts. As discussed in other parts of this opinion, the following material information was either misrepresented or omitted: (1) the composition and lack of independence of World-Wide's board of directors, (2) Hale's transfer of the overvalued and unmarketable medallions to World-Wide's inventory in exchange for 300,000 shares of stock, (3) World-Wide's direct competition with East Coast Coin Company, (4) the true financial condition of World-Wide, (5) the complete terms of the consulting agreement between Hale and Hamrick, (6) World-Wide's failure to make any substantive corrections with respect to its internal accounting controls and the accuracy of its books and records, (7) the circumstances surrounding the substantial inventory write-down following the 1980 audit by May, Zima, and (8) World-Wide's acquisition of Florafax stock after Hale had filed a Scheduled 13D with the SEC to disclose his acquisition of 5% of Florafax stock. These facts were material to World-Wide's shareholders. *See TSC Industries v. Northway Industries, Inc., supra.*

Furthermore, many of the World-Wide's Form 10Q and 8K's were filed with the SEC substantially late, which is in violation of section 13(a) of the 1934 Securities Exchange Act. *SEC v. Falstaff Brewing Corp.,* 629 F.2d 62 (D.C.Cir.1980). As the issuer of the securities, World-Wide is principally responsible for the violation of these provisions. Furthermore, Hale and Seibert, as directors, either prepared the misleading reports or reviewed every document filed with the SEC, taking no steps to ensure disclosure or to correct misleading disclosures. Accordingly, they aided and abetted World-Wide in failing to file the required reports or making the late filings.

## INJUNCTIVE RELIEF

Under section 21(d) of the 1934 Act, the SEC is authorized to seek injunctive relief whenever it appears that a person is engaged in or about to engage in acts or practices which constitute a violation of the federal securities laws. 15 U.S.C. § 78u(d). The district court is required to grant the requested injunction upon a proper showing by the SEC. 15 U.S.C. § 78u(e). To satisfy this "proper showing" requirement, the SEC must establish that the defendants are engaged in or about to engage in practices that violate the federal securities laws. *SEC v. First Financial Group of Texas,* 645 F.2d 429 (5th Cir.1981); *SEC v. Mize, supra.* In order to prove this likelihood of future violations, the SEC must go beyond the mere fact of past violations. *SEC v. Blatt,* 583 F.2d 1325 (5th Cir.1978).

This court must consider several factors in deciding whether to issue an injunction in light of past violations. Such factors include the egregiousness of the defendants' actions, the isolated or recurrent nature of the infractions, the degree of scienter involved, the sincerity of the defendants' assurances against future violations, the defendants' recognition of the wrongful nature of this conduct, and the likelihood that the defendants' occupation will present opportunities for future violations. *SEC v. Caribba Air, Inc., supra;*

*SEC v. Blatt, supra.* The critical question in issuing an injunction is whether the defendants' past conduct indicates that there is a reasonable likelihood of further violations in the future. Furthermore, the Eleventh Circuit has held that assertions by the defendants to cease any wrongful conduct are by no means dispositive of the case. *SEC v. Caribba Air, Inc., supra.*

In the permanent undertaking filed by the defendants with this court, the defendants, without admitting any intention to violate the securities laws or any likelihood of future violations, admitted the failure to file certain reports and tardiness in filing other reports. In this undertaking, they agreed to file all required reports on a timely basis and to file other materials such as Schedules 13D and 14D–1 with the SEC. No undertaking is made, however, with respect to what this court considers to be the more egregious violations of the 1934 Act: specifically, the numerous violations of the FCPA, the failure to disclose material information in the 10K reports, the lack of documentation with respect to the $1,700,000 worth of checks drawn to Hale, his affiliates, or to cash, and the lack of documentation with respect to the purchase and sale of numerous Rolex watches. These failures to disclose and other violations of the FCPA were not isolated, since they were continuous for a period of two years up through the time of trial. The SEC clearly established at trial that the defendants knowingly and intentionally failed to disclose or misrepresented the true financial condition of World-Wide and numerous transactions of the company. It further appears that the nature of the rare coin business presents numerous opportunities for future violations of the FCPA, since there has been no indication that there have been substantial improvements in the internal accounting controls or the accounting procedures of the company.

■ It is not the numerous tardy filings and reports or the failure to file certain reports that concerns this court, since this court does not believe that mere technical violations such as late filings justify the full range of SEC enforcement proceedings. The situation presented in this case, however, is much more than a case of late filings, and it is the concern over the past and present management of World-Wide and the fear that no steps have been taken to alleviate the problems with inadequate personnel, accounting procedures, internal controls, and inadequate documentation of transactions that compel this court to issue the injunctive relief requested by the SEC. The SEC has clearly demonstrated both the presence of past violations of the securities laws and the likelihood of further violations in the future. World-Wide, Hale, and Seibert have exhibited a pattern of continuing violations since July 1979 and have exhibited a total disregard for the principles of full and fair disclosure as mandated by the federal securities laws.

In addition to injunctive relief, the SEC requests the court to order a full fraud accounting and disgorgement of wrongfully received benefits. The issuance of an injunction acts as a deterrent to future violations but does not correct the consequences of past activities conducted by World-Wide, and this court must fashion an equitable remedy to fit the situation presented. *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *SEC v. Blatt, supra; SEC v. Manor Nursing Home,* 458 F.2d 1082 (2d Cir.1972).

■ This court agrees that a full accounting by an independent auditor is necessary to trace the disposition of assets and inventory since July 1, 1979. This accounting must be accomplished to determine whether the funds and property of World-Wide have been properly accounted for or whether the funds have been misappropriated. The SEC established at trial that no source documentation exists for approximately $1,700,000 in checks drawn to Hale, his affiliate companies, or to cash, and that there is inadequate documentation with respect to the purchase and sale of

numerous Rolex watches initially purchased from Tiffany's.

The SEC further requests that Hale be ordered to return 260,000 shares of World-Wide common stock to the company, this amount reflecting Hale's gain from the transfer of the overvalued gold, silver, and bronze medallions in exchange for 300,000 shares of stock. In its order of March 29, 1983, this court ordered both Hale and Seibert to return whatever shares of World-Wide stock they may hold to the company. The purpose of disgorgement is remedial, not punitive, and the court's power to order it extends only to the amount, with interest, by which the defendants' profited from their wrongdoing. *SEC v. Commonwealth Securities, Inc.,* 574 F.2d 90 (2d Cir.1978).

## CONCLUSION

It is hereby ORDERED that Hale return 260,000 shares of World-Wide stock to the company, as a return of wrongfully received benefits from the fraudulent swap of overvalued medallions for stock. The court's order of March 29, 1983, is hereby MODIFIED in the following respect: Although Hale is ordered to return 260,000 shares of stock to the company, whatever other shares of World-Wide stock he may hold, and whatever World-Wide stock Seibert may hold, are to be placed in an escrow account until the completion of a full fraud accounting by an independent auditor. This accounting is to be accomplished within 90 days of this opinion; following its completion, the parties are ordered to submit the results to this court so that a determination may be made with respect to the disposition of the shares of stock held in escrow and the necessity of any other equitable relief.